JEANETTE S. WOOD *vs.* WALDORF SYSTEM, INCORPORATED.

AUGUST 9, 1951.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

FLYNN, C. J. . This action of trespass on the case for negligence was brought to recover for personal injuries and other damages alleged to have resulted from the presence of a deleterious substance in food dispensed to the plaintiff by the defendant in its restaurant. A jury in the superior court awarded a verdict to the plaintiff in the sum of $7,500. Thereafter defendant's motion for a new trial was granted unless plaintiff remitted all of the verdict in excess of $5,500. The plaintiff duly filed such a remittitur and the case is before this court on defendant's bill of exceptions. It relies on its exceptions to the denial of its motion for a directed verdict, to a certain portion of the charge as given, to the refusal of defendant's second request for special instructions, and to the denial of its motion for a new trial unconditionally. All other exceptions not briefed or argued are deemed to be waived.

Most of the facts in evidence are not disputed. Plaintiff on October 26, 1949 went to defendant's restaurant on Mathewson street in the city of Providence, where she ordered a bowl of chicken soup. The soup was served to her by defendant's servant and contained rice or barley, and perhaps some diced carrots. When she had taken a few spoonfuls something stuck in and across her throat, causing her to choke and otherwise to suffer pain and to become hysterical. While her companions sought medical and other assistance the cashier at defendant's restaurant put her finger in plaintiff's throat and dislodged a chicken bone about three quarters of an inch or an inch long. Apparently the bone went down into the plaintiff's stomach and her extreme distress was relieved immediately.

After examination by an interne from the hospital who arrived in an ambulance she walked back to her work. Later that afternoon she went to a hospital for examination and X rays. Three pictures were taken from different angles, and the physician's report based on the pictures and a bronchoscopic examination showed no obstruction and no treatment was necessary. The expense of the X rays was $5.

The plaintiff, however, on October 27, 1949 first visited Dr. Paul J. Rozzero who treated her two or three times at most. He was not called as a witness, and his bill amounted to $13. She later was treated by Dr. Gustaf Sweet on November 7, 1949 and on six additional visits until May 31, 1950. His bill for services was $31. Upon his reference she went to Dr. Himon Miller, a psychiatrist, on December 14, 1949, and was treated on four later occasions, his last examination being October 10, 1950. His bill was $35. All of these visits were at the offices of the doctors. In addition plaintiff claims expenditures for medicines which apparently amounted to about $150.

During the time of treatment plaintiff claims that she had been suffering from nervous choking and vomiting spells; that her throat was sore and swollen; that her left ear ached and throbbed; that her sleep was frequently interrupted; and that she was able to eat only a liquid diet for three months, lost ten pounds, suffered vitamin deficiency, and was not able to return to work until July 31, 1950. She contends that for eight weeks it was necessary to have practical nursing and housekeeping assistance during her disability, and that when she returned to work on July 31, 1950, after about thirty-nine weeks' absence, she was compelled by her condition to take a job, with no responsibility, as a solderer for five hours a day at $22 per week.

It appears, however, that she had been a regular patient under the care of Dr. Sweet from September 1946 for hypertension. But he testified that "she had never at any time

appeared as nervous and irritable as she was at the time I examined her following the accident," and that such increased nervousness was probably caused by the accident. Apparently her previous condition did not prevent her from working regularly as a fine gold solderer for five years at jewelry concerns where she received $52 per week, and also as a waitress at Gibson's restaurant where she worked three evenings a week from about 6 to 11 p.m. averaging an additional $30 per week.

Dr. Miller, to whom plaintiff was referred by Dr. Sweet, specialized in treating nervous patients. He testified that plaintiff was suffering from a form of nervousness or anxiety hysteria, probably resulting from the mishap; that the experience from the accident aggravated her previous condition; and that while there was no continuing physical injury to support her nervous reactions, such reactions, though subjective, were nevertheless real to her. Both Doctors Sweet and Miller indicated that her condition was considerably improved at the time of the trial.

The defendant introduced no evidence to explain the presence of the bone or otherwise to show an exercise of reasonable care on its part. It merely presented one witness as to the plaintiff's hospital record, which record was introduced in evidence, and then rested its case.

The defendant has argued its exceptions under four general points and we shall treat them in the same manner. Its principal contention is that the trial justice erred in denying its motion to direct a verdict for defendant. It is urged substantially that there was no evidence to establish a want of ordinary care on the part of defendant; that the presence of a chicken bone in the soup would not of itself constitute evidence of defendant's negligence; that the case is distinguishable from *Minutilla* v. *Providence Ice Cream Co.*, 50 R. I. 43, and *Chisholm* v. *S. S. Kresge Co.*, 55 R. I. 422; and that as a matter of law there was no evidence

of defendant's negligence and none whereby the bone could be considered a foreign substance.

The transcript is silent as to the method or conditions under which this soup was prepared for serving. We are asked by defendant's argument to take judicial notice of the fact that a chicken bone of this type is natural or perhaps necessary to the preparation and serving of chicken soup. We are not disposed to speculate as to how chicken soup is or should be prepared. Assuming that chicken bones are natural to and are used in the preparation of such soup, we do not think that it is necessary, natural or customary that harmful bones be allowed to remain concealed in this type of soup as finally dispensed to a customer so as to relieve the purveyor of such food of all responsibility. In our judgment the question is not whether the substance may have been natural or proper at some time in the early stages of preparation of this kind of soup, but whether the presence of such substance, if it is harmful and makes the food unfit for human consumption, is natural and ordinarily expected to be in the final product which is impliedly represented as fit for human consumption.

It is true that the instant case is not the same in all respects as either the *Minutilla* or the *Chisholm* case, *supra*, wherein the broken glass and wire respectively in the food there involved was entirely foreign to both its preparation and serving. On the other hand the kind of soup served here is not to be compared with food which normally contains an obvious bone, or that ordinarily is expected by the customer to have a bone or bones therein, such as certain steaks, chops or fish. However, where the food served is to be ingested more by drinking or direct swallowing without mastication, and the presence of a harmful bone is not usually to be expected by the customer and is concealed from ordinary observation, such a bone poten-

tially can be as harmful as either of the foreign substances in the above-mentioned cases.

Unless we hold that defendant is under no duty to use ordinary care in the serving of such soup so that it is free from harmful, concealed and unexpected bones, and that the customer on the other hand is under a duty to antici- pate the presence of such bones and to protect himself, then the evidence here, unexplained in any way, would support some inference inconsistent with defendant's exercise of ordinary care. Conceivably the weight to be given such an inference will vary with circumstances, depending upon the nature of the food and of the harmful substance, the established custom to be expected by the patron in connection with the serving of such food, and the relation of these elements to the other facts in evidence. But the weight to be given such inference in a proper case is for the jury to determine.

In our judgment the instant case comes within the principle of law enunciated and applied in the *Minutilla* and *Chisholm* cases, *supra*. Here the food was prepared and served under the exclusive supervision of the defendant and its servants. There was no evidence of plaintiff's contributory negligence, none that contradicted the actual presence of a harmful bone concealed in this kind of soup, and none denying that such bone had stuck in plaintiff's throat and was dislodged by defendant's cashier. The facts in evidence as to the nature and presence of the bone are nowhere explained. When considered most favorably to plaintiff, as we must on a motion to direct a verdict, such evidence would support a logical inference by the jury that the concealed presence of such bone in this kind of soup, which was impliedly represented by defendant to be fit for human consumption, was inconsistent with defend- ant's exercise of due care in the existing circumstances. On this record we are of the opinion that defendant's motion for a directed verdict was properly denied.

The cases relied upon by defendant do not concern such liquid types of food as here, and more important appear to be governed by the law of their respective jurisdictions. In effect they seem to relieve the purveyor of food practically of all duty to use ordinary care where the substance complained of is not entirely foreign to the preparation and serving of the food, thus casting on a patron the burden to anticipate and protect himself against the presence of such foreign substance in the food. In our opinion those cases are not in harmony with the rule followed in a majority of jurisdictions and also in this state as to the duty of a purveyor of food in an action of the case for negligence based on the presence of harmful or deleterious substances in food which defendant impliedly represents as fit for human consumption.

The defendant also contends that the trial justice erred in reading to the jury excerpts from Corpus Juris, *Chisholm* v. *S. S. Kresge Co., supra,* and a Delaware case setting forth the law applicable to a case of this kind. This argument is based on defendant's assumption that the instant case does not come within the principle of law therein enunciated and that there was no evidence of a foreign substance or want of ordinary care on the part of the defendant. In view of our previous discussion and holding that the case is governed in principle by the law stated in the *Minutilla* and *Chisholm* cases, *supra,* which is in harmony with the substantive law read to the jury from the other authorities in question, we are of the opinion that this objection has no merit.

The defendant further contends that the trial justice erred in refusing to grant its request numbered 2 for special instructions, which reads:

> "Bones are natural to chicken and as the testimony of the plaintiff shows that there was chicken meat in the chicken soup, a chicken bone under these circumstances cannot be called a foreign substance, and a consumer who eats chicken soup containing chicken

meat ought to anticipate and be on her guard against the presence of chicken bones."

It is argued that the court, having previously given defendant's first special request, to the effect that the presence of the bone did not of itself constitute negligence, should have given the second request and that the failure to do so was error. We do not think that this conclusion follows. In our judgment the request is argumentative, unnecessary and might mislead as to defendant's proper duty. In any event we think it was not prejudicial error to refuse it since it does not properly and fully state the law applicable to plaintiff and defendant in the circumstances of record.

The defendant finally argues that the trial justice concluded that the jury was swayed by sympathy, and that his action in ordering a remittitur confirms the view that the verdict was the result of sympathy and not based upon the evidence. So far as the verdict as to liability is concerned, we cannot say that on this record the trial justice was clearly wrong in approving the verdict. It was for the jury to draw and weigh the inferences logically arising from a consideration of all the facts. In the absence of any evidence to show the defendant's exercise of reasonable or ordinary care in the circumstances, the jury was warranted in returning a verdict for the plaintiff and there was no error in the trial justice's decision approving that verdict as to liability.

On the question of damages the trial justice decided that plaintiff's nervous condition was due considerably to her years of overtime work and her previous health, for which she had treated with Dr. Sweet; and that "the jury was swayed by sympathy, and *mulcted* the defendant in damages for a condition not of its doing." (italics ours) He conceded that "her nervous state was aggravated," for which she was entitled to compensatory damages but that "The jury was influenced by sympathy and assessed damages *far in excess* of any injury which the defendant caused by

10

its negligence." (italics ours) He therefore ordered a remittitur of $2,000, leaving a verdict of $5,500.

From a reading of the transcript we cannot say that the trial justice's appraisal of the jury's reaction was clearly wrong. It indicates that the plaintiff, unconsciously perhaps, had a tendency to exaggerate the physical effects of the injury. But if the trial justice from his observation of the witnesses and from an independent examination of the evidence felt the way he wrote about the verdict in relation to the damages, and if the evidence supports that view, he should have ordered a larger remittitur. We have examined the transcript, and in our opinion the verdict as reduced by the trial justice is still grossly excessive. In the peculiar circumstances we are of the opinion that $4,000 would reasonably compensate the plaintiff for her loss of wages, for hospital and medical expenses, and for her pain, suffering and injury due proximately to the accident.

The defendant's exception is sustained on the ground of excessive damages, and the case is remitted to the superior court for a new trial unless the plaintiff shall on or before August 24, 1951 file in the office of the clerk of the superior court a remittitur of all of the verdict in excess of $4,000. If such remittitur is filed as aforesaid the superior court is directed to enter judgment for the plaintiff on the verdict as reduced by the remittitur.

*Voigt, Wright & Slade, Ernst T. Voigt, Edward J. Plunkett,* for plaintiff.

*McKiernan, McElroy & Going, Edward F. McElroy,* for defendant.