**JIM DANDY FAST FOODS, INC., d/b/a Church's Fried Chicken, Appellant,**

v.

**Miriam CARPENTER, Appellee,**

**No. 16663.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

April 1, 1976.

Chilton Bryan, Ronald J. Sommers, Houston, for appellant.

Simpson, Motgan & Burwell, Susan W. Burris, Texas City, for appellee.

COLEMAN, Chief Justice.

Miriam Carpenter, plaintiff, sued Jim Dandy Fast Foods, Inc., to recover damages by reason of personal injuries suffered by her as a result of eating a piece of chicken sold to her by defendant. Judgment was rendered for the plaintiff based on the jury verdict.

Jim Dandy Fast Foods, Inc., owns and operates a retail fried chicken restaurant known as Church's Fried Chicken located in Texas City, Texas. On September 16, 1970, plaintiff entered this restaurant and ordered a fried breast of chicken. After receiving her order, she sat down at a table. She then took her fingers and pulled a piece from the meaty portion of the chicken breast and put it in her mouth. This was a piece of white meat covered with a heavy crust. She chewed it up and swallowed it. She then felt something in her throat and took a bite of bread thinking that a piece of the crust had stuck in her throat and the bread would cause it to go on into her stomach. After she realized it was a bone, she attempted to remove it with her finger. Her attempt was unsuccessful and she was bleeding. She asked an employee to direct her to a doctor and was eventually admitted to a hospital where a piece of bone was removed from her throat.

There is testimony that the doctor and his nurse accompanied the plaintiff as she left the operating room and that the doctor gave to plaintiff's husband a piece of chicken bone at that time. The trial court admitted this piece of bone into evidence. This is a small curved bone one inch in length. One end is smoothly cut at an angle creating a sharp point. The other end is not a smooth cut.

The plaintiff testified that she knew that there were bones in chicken and that she knew certain areas where those bones were located. She did not expect a bone to be in the part of the chicken breast which she placed in her mouth. She had never encountered a bone in that particular part of the chicken. When she received the chicken she couldn't see anything wrong with it such as bones sticking out. She did not feel the bone as she chewed the chicken.

Dr. Stiernberg, an ear, nose and throat specialist, testified that he removed a piece of chicken bone from the plaintiff's esophagus. He did not remember whether or not he gave the piece of bone to the plaintiff.

Mr. Pete Ober testified that for many years he had been engaged in the meat business and was experienced in cutting up chicken for the retail trade. He had examined the piece of bone introduced as an

exhibit in this case. He testified that he had never seen a chicken bone cut like that before. He testified that the piece of bone was a part of the wishbone. He always disjointed the chicken and left the wishbone whole. He stated that it was not proper to cut up a chicken in such a manner as to leave part of the breast meat on the wing piece. He stated that while the wishbone was part of the breast it was not joined to the breastbone. He testified that the wishbone was ordinarily cut as a separate piece of chicken, but that at times the breast was split. In such a case half of the wishbone would be found which would be a lot longer than the piece in question. He testified that if a person is eating a piece of breast and pulls off one piece of the breast he should not encounter a bone like the one in question.

Mr. Lawrence Smith, president of City Poultry Processing Company, a division of Jim Dandy Fast Foods, testified. He was familiar with the manner in which chickens were cut up for Church's Fried Chicken. It is an 8-piece cut. There are nine government inspectors and one government grader in the plant at all times that it is in operation. The inspectors check to see that the poultry is fit for human consumption and the grader checks to see whether the chicken is properly cut.

Mrs. Lois Hale who is a supervisor with the defendant testified that the U.S.D.A. inspectors make a random check probably two times a day to determine whether the chicken is cut up in the fashion established by the defendant. They do not examine individual pieces other than to see that they are cut in a uniform manner. She testified that the wishbone is not taken off but that it is a part of the piece of breast.

Mr. Smith testified that 50,000 to 60,000 chickens per day were processed in the plant; that the management specifies that chickens be cut into eight pieces and that they advertise larger, bigger and better pieces. The cutters are instructed to cut the breast into two pieces except that part of the breast is also left attached to each wing in order to give the wing portion a little more of a meaty characteristic. The upper shoulder of the breast is left attached to the wing and the remainder is cut into two pieces. The inspections are visual and are made by means of random spot checks.

Mr. Smith testified that if the chicken is improperly cut internally so that a bone is "cut internally incorrectly" there would be no way to find this from a visual inspection. He was asked, "If something in wrong on the inside, say chipping has occurred where bone got imbedded in the meat, there would be no way for the inspector to notice this?" In answer he stated: "I don't know. I assume if it was deep in the meat, they don't x-ray or anything of that nature. It's possible." Mrs. Hale was shown the bone which was introduced into evidence and was asked if she would expect to encounter a bone like that in the breast and she answered that she would. When she was asked if she would expect it to be off the front of the breast she answered, "No, no. No, not on the meaty part, no." She stated that if you pull of a piece of the meat from the front of the breast the piece of bone would not be in there. She had never seen a bone in the meaty top part of the breast. She testified that it was their practice to split the breast down the center and that the pulley bone would be cut into two pieces, but that the pieces would not look like the exhibit in this case. She further stated that she did not know whether she had ever cut anything like the exhibit because "it's in the meat."

In answer to Special Issue No. 1 the jury found that the chicken served by the defendant to the plaintiff on September 16, 1970, "was in a defective and unreasonable dangerous condition making it unfit for human consumption." By answer to Special Issue No. 2 the jury found that the "defective and unreasonable dangerous condition" of the chicken was a proximate cause of the plaintiff's injuries.

Special Issue No. 4 reads:

"Do you find from a preponderance of the evidence that Miriam Carpenter, in buying and receiving the chicken breast in question, at the time and on the occa-

sion in question, had reasonable expectation of finding bones in, about, and around the chicken breast, as she bit into, chewed, and swallowed the chicken breast and knew that she would have to use the care and prudence for her own safety in the exercise of such precaution for her own well being, as a person of ordinary prudence in the exercise of ordinary care under the same or similar circumstances?"

The jury answered, "She did have reasonable expectation." but in answer to the next special issue failed to find that the failure of Miriam Carpenter with respect to the reasonable expectation of finding bones was a proximate cause of any injury or damage she received.

The jury failed to find that Miriam Carpenter assumed the risk of chicken bones in eating the chicken and failed to find her guilty of any acts of contributory negligence. The jury found damages in the sum of $1500.00.

The appellant objected to Special Issue No. 1 on the basis that there was no evidence, or insufficient evidence, to warrant the submission of the issue to the jury. The appellant also urged a motion for judgment notwithstanding the verdict of the jury for the reason that the plaintiff "totally failed to prove that the piece of chicken was defective, inedible, and unreasonably dangerous at the time it left the hands of the defendant." In connection with these points the appellant calls attention to the testimony on the part of the plaintiff that she knew that the piece of breast of chicken that she got from appellant had some bones attached and that she knew there were bones in chicken.

In response the plaintiff argues two propositions: first, that the piece of chicken was improperly cut and that the wishbone was not in its normal and expected size and shape, and second, that the piece of chicken breast was so cut by the defendant as to place a segment of the wishbone in the fleshy part of the chicken where its presence would not be anticipated. They contend that the piece of chicken cut in this manner was defective and that by reason of the defect the jury was entitled to find that it was not reasonably fit for human consumption.

 It has long been established in this state that where food products sold for human consumption are unfit for that purpose, the law imposes a warranty of purity in favor of the ultimate consumer as a matter of public policy. *Jacob E. Decker & Sons, Inc. v. Capps,* 139 Tex. 609, 164 S.W.2d 828 (1942).

 Texas is firmly committed to the rule stated in the Restatement of Torts, 2d ed., Sec. 402A. The rule of strict liability there stated is applicable to vendors of food. In order to prevail under the rule of strict liability, the plaintiff must prove that the injury which he sustained was caused by the unwholesome and unfit condition of the food served to him. The fact that the food served was unfit for human consumption can be shown by circumstantial evidence. *Hebert v. Loveless,* 474 S.W.2d 732 (Tex. Civ.App.—Beaumont, 1971, ref. n. r. e.); *F. W. Woolworth Co. v. Garza,* 390 S.W.2d 90 (Tex.Civ.App.—San Antonio, 1965, writ ref'd n. r. e.).

A recovery was denied the plaintiff in a case where he broke a tooth by biting on a cherry pit concealed in a cherry pie. *Hunt v. Ferguson-Paulus Enterprises,* 243 Or. 546, 415 P.2d 13 (1966). It was contended in that case that there was a breach of a warranty imposed by law that the pie was reasonably fit for human consumption. The court noted that in the consideration of similar cases some of the courts have drawn a distinction between injury caused by spoiled, impure, or contaminated food or food containing a foreign substance, and injury caused by a substance natural to the product sold, and in the latter class of cases these courts hold that there is no liability on the part of the dispenser of food. As an example, the court cited *Mix v. Ingersoll Candy Co.,* 6 Cal.2d 674, 59 P.2d 144, where the court said:

 " . . . despite the fact that a chicken bone may occasionally be encountered in a chicken pie, such chicken pie, in

the absence of some further defect, is reasonably fit for human consumption. Bones which are natural to the type of meat served cannot legitimately be called a foreign substance, and a consumer who eats meat dishes ought to anticipate and be on his guard against the presence of such bones."

The Oregon court then noted that other courts have rejected the so-called "foreign-natural" test in favor of what is known as the "reasonable expectation" test. As an example, the court cited *Betehia v. Cape Cod Corp.*, 10 Wis.2d 323, 103 N.W.2d 64, which held that a person who was injured by a chicken bone in a chicken sandwich served to him in a restaurant could recover for his injury. The Wisconsin court stated:

" 'There is a distinction between what a consumer expects to find in a fish stick and in a baked or fried fish, or in a chicken sandwich made from sliced white meat and in roast chicken. The test should be what is reasonably expected by the consumer in the food as served, not what might be natural to the ingredients of that food prior to preparation. What is to be reasonably expected by the consumer is a jury question in most cases; at least, we cannot say as a matter of law that a patron of a restaurant must expect a bone in a chicken sandwich either because chicken bones are occasionally found there or are natural to chicken.' 10 Wis.2d at 331–332, 103 N.W.2d at 68."

An action against the packer of boned chicken in a sealed can for personal injury sustained by a small girl eating Chow Mein containing chicken taken from the can, when a small bone lodged in her esophagus, was considered by the Maryland Court of Appeals in *Bryer v. Rath Packing Co.*, 221 Md. 105, 156 A.2d 442, 77 A.L.R.2d 1 (1959). There the Court of Appeals reversed the judgment of the trial court which was based on a directed verdict for the defendant. The court found a division of authority on the question of whether bones which are natural to the type of food eaten, but which generally are not found in the style of food as prepared, are to be deemed the equivalent of a foreign substance in determining whether the food in which they are found is reasonably fit and safe for human consumption. The court reviewed a number of authorities and determined that the question of fitness and safeness for human consumption is measurable by the same tests in both warranty cases and negligence cases and found that an issue of fact was raised.

Some courts hold that the fact that the substance in a food product causing harm to a consumer is natural to the food eaten, such as a piece of oyster shell in a can of oysters, or a splinter from a bone in a t-bone steak, is merely persuasive and relevant evidence bearing on the question as to whether the product was in fact reasonably fit for human consumption as food. Other courts hold that where a potentially harmful substance in a food is natural to the product and it can be said as a matter of common knowledge that such product occasionally contains such a substance, the product is as a matter of law reasonably fit for human consumption. *Bonenberger v. Pittsburgh Mercantile Co.*, 345 Pa. 559, 28 A.2d 913 (1942).

The question is whether the piece of chicken was in a defective condition unreasonably dangerous to the plaintiff. The Restatement of Torts, 2d, Sec. 402A; *Rourke v. Garza*, 530 S.W.2d 794 (Tex.1975). Comment g. to Sec. 402A, supra, states that the rule applies "only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." The defective condition may be the result of the way in which the product is prepared. Comment h., supra. An article is unreasonably dangerous when the article sold is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Comment i., supra.

■ There is evidence that the piece of chicken was not cut in the usual and customary manner. The wishbone was smaller

than might be expected; the bone was relatively sharp at both ends. The consumer would expect to find bones in and about such a piece of chicken. We think reasonable minds could differ as to whether this bone was in a condition not contemplated by the ultimate consumer. Reasonable persons might also differ as to whether the piece of chicken in which this particular bone was found was dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it with the ordinary knowledge common to the community as to its characteristics. A jury question was presented which was resolved by the jury in favor of the plaintiff. The court did not err in rendering judgment for the plaintiff. Nor did the court err in overruling defendant's exception and objections to Special Issue No. 1 of the court's charge.

Each finding made by the jury was supported by evidence of probative force. We find no points of error which properly present a question concerning the great weight and preponderance of the evidence. In no point does the appellant contend that the trial court erred in overruling its motion for new trial because a finding was contrary to the great weight and preponderance of the evidence. It does complain that the court erred in rendering judgment for the plaintiff because certain issues were contrary to the great weight and preponderance of the evidence, and further presents points contending that the court erred in overruling the defendant's exceptions and objections to certain special issues for the reason that an answer to such issue would be against the great weight and preponderance of the probative evidence. *McDonald v. New York Central Mutual Fire Ins. Co.*, 380 S.W.2d 545 (Tex.1964); *Woolworth Co. v. Garza*, 390 S.W.2d 90 (Tex.Civ. App.—San Antonio, 1965, writ ref'd n. r. e.).

The judgment is affirmed.