[No. S012707. Jan. 23, 1992.]

MEXICALI ROSE et al., Petitioners, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
JACK A. CLARK, Real Party in Interest.

618

## COUNSEL

Kincaid, Gianunzio, Caudle & Hubert, John P. Caudle, Scott A. Bovee and M. David DeSantis for Petitioners.

Steefel, Levitt & Weiss, Leonard R. Stein, and Daryl S. Landy as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

William L. Berg for Real Party in Interest.

Douglas Devries, Leonard Sachs, Bruce Broillet, Laurence Drivon, Robert Steinberg, Roland Wrinkle, Harvey R. Levine and David Harney as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**LUCAS, C. J.**—We granted review to consider the continuing vitality of *Mix v. Ingersoll Candy Co.* (1936) 6 Cal.2d 674 [59 P.2d 144] (hereafter *Mix*), which held a restaurant owner was not liable in tort or implied warranty for injury to a patron caused by a chicken bone served in a chicken pie.[1] (*Id.* at p. 682.) *Mix* distinguished bones and other substances "natural" to certain types of food, from "foreign substances" (such as a nail, wire or glass), which *Mix* determined cannot be anticipated by a reasonable consumer.[2] *Mix* concluded that "[b]ones which are natural to the type of meat served cannot legitimately be called a foreign substance, and a consumer who eats meat dishes ought to anticipate and be on his guard against the presence of such bones." (6 Cal.2d at p. 682.) Under *Mix*, therefore, a substance causing injury that is natural to the food served can never lead to tort or implied warranty liability.

---

[1] Our holding is limited in application to commercial restaurant establishments.

[2] The phrase "reasonable consumer" or "ordinary consumer" refers to the reasonable person (under the circumstances) or the reasonable child (defined as a reasonable person of like intelligence, age and experience under the circumstances). (See, e.g., Rest.2d Torts, §§ 283, 283A.)

Real party in interest (plaintiff), Jack A. Clark, was a customer at petitioners' (defendants') restaurant. He ordered a chicken enchilada and sustained throat injuries when he swallowed a one-inch chicken bone contained in the enchilada. He brought an action for damages based on theories of negligence, breach of implied warranty, and strict liability. He alleged defendant Mexicali Rose negligently left the bone in the enchilada and the food was unfit for human consumption. He also asserted he did not expect to find a bone, and it is not common knowledge there may be bones in chicken enchiladas. In addition, plaintiff sought punitive damages, alleging malice, fraud, and oppression based on the allegation defendants initially refused to obtain medical assistance for him.

The trial court overruled defendants' demurrer, but the Court of Appeal issued a writ of mandate, directing the trial court to sustain the demurrer on all causes of action. The Court of Appeal noted it was compelled, under principles of stare decisis, to follow the *Mix* rule precluding liability for injuries caused by naturally occurring substances in food. On appeal, plaintiff asserts the foreign-natural test draws an arbitrary line of liability, focusing on the substance itself, and unfairly exonerates the restaurateur from all liability simply because the injury-producing substance happens to be "natural" to the food served. Pointing to changes in technology that have occurred during the past 55 years, plaintiff asserts defendants should be held responsible for the failure to remove all bones from its chicken enchiladas because it is today easier to remove bones from food than it was in 1936, when *Mix* was decided. Plaintiff contends we should abandon the foreign-natural test of *Mix, supra,* 6 Cal.3d 674, and adopt a test developed in other jurisdictions based on the "reasonable expectations" of the customer. (See, e.g., *Ex Parte Morrison's Cafeteria of Montgomery, Inc.* (Ala. 1983) 431 So.2d 975, 978 (*Morrison's Cafeteria*).)

Under the foregoing proposed test, according to plaintiff, defendants could be held (i) liable in negligence for their failure to exercise reasonable care in the preparation of the food, (ii) liable for violating California's statutory implied warranty because a chicken bone in a chicken enchilada renders the latter unfit for human consumption under the implied warranty of merchantability and fitness of California Uniform Commercial Code sections 2314 and 2315, and (iii) strictly liable because the food item was "defective" under the theory of Restatement Second of Torts section 402A, comment i, imposing strict liability when food is "dangerous beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

The question we address, therefore, is whether a restaurant keeper may be held liable for serving food containing substances natural to the product that,

when consumed by the patron, cause injury. As explained below, we agree with plaintiff that a "reasonable expectation" test is applicable in this context and, in part at least, is consistent with the development of tort law in our jurisdiction. Accordingly, we adopt that test as our own. As we further explain, although we conclude that under a reasonable expectation test plaintiff may not state a cause of action under the theories of strict liability or breach of the implied warranties of merchantability or fitness, we conclude that under the same test, he may state a cause of action in negligence based on defendants' asserted failure to exercise due care in the preparation of the chicken enchilada.

1. *Mix and its progeny: The foreign-natural test and the reasonable expectations of the consumer*

An early rule of implied warranty in cases involving foreign or adulterated food substances was adopted, as of 1960, by 17 jurisdictions, including California. (Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)* (1960) 69 Yale L.J. 1099, 1106.) ■ A review of the California cases reveals that the acceptance of an implied warranty rule against manufacturers in cases involving unfit foodstuffs was based on the rationale that a manufacturer that sold food items could no longer hide behind the shield of privity to absolve itself of liability. (*Klein v. Duchess Sandwich Co., Ltd.* (1939) 14 Cal.2d 272 [93 P.2d 799] (*Klein*); *Vaccarezza v. Sanguinetti* (1945) 71 Cal.App.2d 687 [163 P.2d 470] (*Vaccarezza*).)

In *Klein, supra,* 14 Cal.3d 272, the plaintiff's husband purchased a sandwich that was infested with maggots. The sandwich had been prepared by the defendant and distributed to a restaurant for sale. (*Id.* at pp. 273-274.) The plaintiff ate the sandwich and became ill. *Klein* interpreted the term "buyer" under the Uniform Sales Act (making sellers of adulterated food liable to buyers) to include the "ultimate consumer," and held that the warranty of fitness should apply to a "manufacturer" of foodstuffs, notwithstanding the fact that a retailer may have sold the goods to the consumer. *Klein* determined that foodstuffs do not fall within the general rule of privity between the manufacturer and the consumer, even though the purchase is made through a retailer. (*Id.* at p. 284; see also *Vaccarezza, supra,* 71 Cal.App.2d 687, 689 [implied warranty imposes an "absolute liability" on manufacturers of food products].)

This same implied warranty for foreign or adulterated substances in food was extended to independent restaurant owners who purchased the food from outside manufacturers in *Goetten v. Owl Drug Co.* (1936) 6 Cal.2d 683, 685 [59 P.2d 142], filed the same day as *Mix, supra,* 6 Cal.2d 674. In *Goetten,* a

patron choked on a piece of glass in a serving of chow mein at the defendant's lunch counter. Initially, we rejected the defendant's contention that furnishing food did not constitute a sale for purposes of statutory implied warranty, and based our holding on the fact that restaurateurs have the food under their control at the time it is served to the patron. (*Goetten, supra*, 6 Cal.2d at p. 687.) We imposed on the restaurateur a burden to inspect the food, reasoning that: "As between the patron, who has no means of determining whether the food served is safe for human consumption, and the seller, who has the opportunity of determining its fitness, the burden properly rests with the seller, who could have so cared for the food as to have made the injury to the customer impossible." (*Ibid.*)

A different rule developed when the injury was caused by an object deemed *natural* to the food being served. In *Mix, supra*, 6 Cal.2d 674, the plaintiff swallowed a fragment of chicken bone contained in a chicken pot pie he consumed in the defendant's restaurant. *Mix* affirmed the trial court order dismissing the plaintiff's complaint for negligence and breach of implied warranty. We held there could be no liability under either an implied warranty or negligence theory, explaining that the statutory implied warranty of fitness of food (see former Civ. Code, § 1735, replaced by Cal. U. Com. Code, §§ 2314, 2315)[3] does not make the purveyor an insurer, but merely requires that food be reasonably fit for human consumption. Although we conceded that it is frequently a question for the jury to determine whether an injury-producing substance present in food makes the food unfit for consumption, we maintained that a court in appropriate cases may find *as a matter of law* that an alleged harmful substance in food does not make the food defective or unfit for consumption. We explained our holding as follows:

---

[3]Former section 1735 of the Civil Code provided: "Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows: [¶] (1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose." Former Civil Code section 1735 was repealed in 1963 and replaced by California Uniform Commercial Code sections 2314 and 2315. Section 2314 states: "Unless excluded or modified . . . , a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale. [¶] (2) Goods to be merchantable must be at least such as [¶] . . . [¶] (c) Are fit for the ordinary purposes for which such goods are used; . . ." Section 2315 states: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

"Bones which are natural to the type of meat served cannot legitimately be called a foreign substance, and a consumer who eats meat dishes ought to anticipate and be on his guard against the presence of such bones. At least he cannot hold the restaurant keeper whose representation implied by law is that the meat dish is reasonably fit for human consumption, liable for any injury occurring as a result of the presence of a chicken bone in such chicken pie. In the case of *Goetten* v. *Owl Drug Co.*, [*supra*, 6 Cal.2d 683] this day decided, we held that the application of the rule of implied warranty might impose a heavy burden upon the keeper of restaurants and lunch counters, but that considerations of public policy and public health and safety are of such importance as to demand that such obligation be imposed. This is true, but we do not believe that the onerous rule should be carried to its extreme limits. Certainly no liability would attach to a restaurant keeper for the serving of a T-bone steak, or a beef stew, which contained a bone natural to the type of meat served, or if a fish dish should contain a fish bone, or if a cherry pie should contain a cherry stone—although it be admitted that an ideal cherry pie would be stoneless." (*Mix, supra*, 6 Cal.2d at p. 682.) We concluded as a matter of law that a chicken pot pie containing chicken bones is reasonably fit for consumption, and there could be no breach of the implied warranty under former Civil Code section 1735. (6 Cal.2d at p. 682.)

As for the negligence claim, we concluded that because the restaurateur had no duty to offer a perfect chicken pie, he or she was not negligent in serving a pie with a bone in it. (6 Cal.2d at pp. 682-683.) *Mix* stated the negligence rule as follows: "[T]he restaurant keeper's obligation is limited to the exercise of due care in the preparation and service of food furnished guests. . . . [A] duty of exercising due care in the furnishing and serving of food to guests exists on the part of a restaurant keeper, and . . . he is liable in damages for any breach of such duty." (*Id.* at p. 680.)

After recognizing the duty of care, however, the *Mix* court observed that injury due to a chicken bone in a chicken pie did not establish a lack of due care amounting to a breach of that duty. The court observed that the negligence issue involved "a question of whether or not a restaurant keeper in the exercise of due care is required to serve in every instance a perfect chicken pie, in that all bones are entirely eliminated. If the customer has no right to expect such a perfect product, and we think he is not so entitled, then it cannot be said that it was negligence on the part of the restaurant keeper to fail to furnish an entirely boneless chicken pie." (6 Cal.2d at p. 683; see also *Silva* v. *F. W. Woolworth Co.* (1938) 28 Cal.App.2d 649 [83 P.2d 76] [no recovery for turkey bone in turkey dressing]; *Shapiro* v. *Hotel Statler Corporation* (S.D.Cal. 1955) 132 F.Supp. 891 [no liability for fish bone in seafood dish].)

In 1963, our Legislature repealed former Civil Code section 1735 and adopted California Uniform Commercial Code sections 2314 and 2315. In adopting the new code sections, the Legislature was aware of the common law distinction between foreign and natural substances when determining liability for breach of the implied warranties. Indeed, the California Code comments to California Uniform Commercial Code section 2314 note the Legislature's recognition of the *Mix* rule: "The second sentence of subdivision (1), defining as a sale the serving of food and drink, is in accord with prior California case law. *Klein* v. *Duchess Sandwich Co.*, 14 Cal.2d 272 . . . and *Mix* v. *Ingersoll Candy Co.*, 6 Cal.2d 674 . . . ." (See 23A West's Ann. Cal. U. Com. Code (1964 ed.) § 2314, p. 265; see also Cal. Code coms. to Cal. U. Com. Code, § 2315, & notes of decisions, note 11 [23A West's Ann. Cal. U. Com. Code, *supra*, § 2315, pp. 288, 297].)

Contrary to Justice Arabian's dissent, our *Mix* rule has not been "universally rejected" but has been followed for over 30 years by several other jurisdictions. For example, in *Brown* v. *Nebiker* (1941) 229 Iowa 1223 [296 N.W. 366], the Iowa Supreme Court held that the plaintiff could not recover for injuries caused by a sliver of bone in a pork chop. In affirming a directed verdict for defendant restaurateur, the court observed, "One who eats pork chops, or the favorite dish of spare ribs and sauerkraut, or the type of meat that bones are natural to, ought to anticipate and be on his guard against the presence of bones, which he knows will be there." (*Id.* at p. 371.)

In *Goodwin* v. *Country Club of Peoria* (1944) 323 Ill.App. 1 [54 N.E.2d 612], the court held that a defense verdict should have been directed in a wrongful death action that arose after a restaurant patron swallowed a bone while eating creamed chicken. The Appellate Court of Illinois observed: "[C]ommon experience dictates that one eating the meat of animals, fowl or fish, should do so with the knowledge that such food may contain pieces of bone. [¶] . . . Although the rule that a restaurant keeper is liable [in implied warranty] for foreign substances in food served to patrons, and is held to impliedly warrant food to be fit and wholesome to be eaten is well settled[,] . . . [w]e do not believe the rule as established in this jurisdiction, exceeds an implied warranty that food served shall be wholesome and fit to be eaten. The importance of pure food to the public must not be ignored. Modern conditions require that establishments serving food shall be operated in a sanitary way and furnish food that is wholesome and fit to be eaten. However, such rule should be construed and applied in a reasonable manner, taking into consideration the common experience of life. When viewed in this light, it must be conceded that practically all meat dishes, whether they consist of beef, pork, fish or fowl, do contain bones peculiar to the food being served." (*Id.* at p. 615.)

In *Norris* v. *Pig'n Whistle Sandwich Shop* (1949) 79 Ga.App. 369 [53 S.E.2d 718], the Georgia Court of Appeals denied the plaintiff recovery in negligence for injuries caused by a bone in a barbecued pork sandwich. The court noted, "[c]ertainly it was not the intent of our lawmakers to deem an article of food, containing meat, adulterated merely because it contained portions of the animal which were inedible, but which did not render such food unfit for its intended consumption. Otherwise numerous articles of food which necessarily contain inedible portions of animal matter would be deemed adulterated. Numerous meats and fish are normally prepared which contain bone and other inedible matter indigenous to the animal from which the food is derived, yet these articles of food could not be deemed adulterated." (*Id.* at p. 723; *Webster* v. *Blue Ship Tea Room* (1964) 347 Mass. 421 [198 N.E.2d 309] [no recovery for injury from fish bone in fish chowder]; *Adams* v. *Great Atlantic & Pacific Tea Co.* (1960) 251 N.C. 565 [112 S.E.2d 92, 94] [no recovery for injuries caused by grain of corn in box of corn flakes]; *Coffer* v. *Standard Brands, Inc.* (1976) 30 N.C.App. 134 [226 S.E.2d 534] [no liability for unshelled filberts]; but see *Goodman* v. *Wenco Management* (1990) 100 N.C.App. 108 [394 S.E.2d 832] [application of *Adams* test would not bar recovery for sizeable bone in hamburger patty].)

## 2. *The evolution of the Mix rule*

More recently, however, courts addressing the foreign-natural distinction have deviated from strict application of *Mix, supra*, 6 Cal.2d 674, to conclude that the ultimate issue of liability should not be based on a determination whether the object causing injury was either foreign or natural, but instead should be based on whether the consumer reasonably should have anticipated the natural injury-producing substance in the food. For example, *Brown* v. *Nebiker, supra*, 296 N.W. at page 371, followed our holding in *Mix*, but also determined that "naturalness" is logically based on the reasonable expectation of the consumer and thus is an issue of fact for the jury to determine unless the injury producing substance is indigenous to the food served. Similarly, although *Allen* v. *Grafton* (1960) 170 Ohio St. 249 [164 N.E.2d 167], is often cited as a case adopting the *Mix* rule, the Ohio Supreme Court stated in dictum that, " '[t]he better test of what is legally defective appears to be what consumers customarily expect and guard against.' " (*Id.* at p. 174.) The *Allen* court then determined as a matter of law that persons consuming oysters can reasonably anticipate and guard against pieces of oyster shells. *Allen* held that "It is our conclusion that the presence in one of a serving of six fried oysters of a piece of oyster shell 'approximately 3 X 2 centimeters in diameter' will not justify a legal conclusion either (a) that that serving of fried oysters constituted 'food' that was 'adulterated' within the meaning of Section 3715.59, Revised Code, or (b) that that serving constituted food not 'reasonably fit' for eating." (*Id.* at p. 175.)

A subsequent Ohio decision rejected the *Mix* notion that natural substances should be anticipated as a matter of law and determined that the trier of fact should decide whether a negligence action should be allowed when a plaintiff has been injured by a piece of ham cartilage in chopped ham. (*Thompson* v. *Lawson Milk Co.* (1976) 48 Ohio App.2d 143 [356 N.E.2d 309] [adopting reasoning of *Allen* v. *Grafton, supra,* 164 N.E.2d 167]; see also *Phillips* v. *Town of West Springfield* (1989) 405 Mass. 411 [540 N.E.2d 1331] [reasonable expectation is a question for jury in action for breach of implied warranty by student injured after biting into turkey cube containing turkey bone].)

Many cases adopting a "reasonable expectation" test, however, did not reject completely the foreign-natural test when the injury was caused by a substance natural to the food served. Rather, several courts have retained the foreign-natural distinction in applying the "reasonable expectation" test. In these cases, the "naturalness" of the substance is used to determine which theory of recovery should be allowed—strict liability, implied warranty and/or negligence. When it is found that the injury-producing substance is natural to the food product, such as a chicken bone in a chicken pie, these courts have applied the *Mix* rule to hold an injured plaintiff cannot state a cause of action based on the breach of the implied warranty of merchantability or strict products liability, because it is a matter of common knowledge that the natural substance is occasionally found in the food served. These courts have departed from *Mix,* however, in holding that under the same facts, an action can be stated in negligence for the failure to exercise reasonable care in the food preparation.

For example, in *Musso* v. *Picadilly Cafeterias, Inc.* (La.Ct.App. 1964) 178 So.2d 421 (*Musso*), the court recognized that the majority of jurisdictions had adopted the foreign-natural test for liability rather than the "reasonable expectation test" and explained: "We believe the majority view on the subject under consideration to be reasonable and sound. It recognizes and affirms the high degree of care imposed upon the server of foods but does not inflict upon him the unconscionable burden of becoming the absolute, unrestricted and unqualified insurer of his customers. If the server permits alien, extraneous matter not constituting a natural part of the ingredients or finished product (such as glass or other noxious substances), to enter his product during preparation or processing, he is liable for breach of his implied duty to serve a product free of foreign, deleterious substances. However, should the restaurant keeper inadvertently leave in the food substances natural to the ingredients or finished product he is not liable to the customer, as the food is not thereby rendered unwholesome and unfit for human consumption. As a result there is no breach of the implied warranty of wholesomeness." (*Id.* at p. 427.)

*Musso*, however, departed from the majority of jurisdictions applying the strict foreign-natural rule of liability by observing that although plaintiff could not recover for breach of the implied warranty of wholesomeness when injured by a natural food substance, he should be allowed to pursue a negligence claim. The *Musso* court observed: "An obvious extension of the foregoing rule must perforce be made where the vendor of foods negligently permits substances natural to the ingredients or finished product to remain in the food served the customer and illness or injury results therefrom. Under such circumstances the restaurant keeper is liable because of his negligence." (*Musso, supra,* 178 So.2d at p. 427.)

In determining whether the restaurant keeper was negligent, the *Musso* court stated the following duty of care respecting the preparation of food: "We believe the degree of care incumbent upon the restaurant operator in selecting, preparing and cooking food for customers, including the removal of substances natural to the ingredients or finished product, such as bones from fish or meat and stones or seeds from vegetables or fruit, is the same as that which a reasonably prudent man skilled in the culinary art, would exercise in the selection and preparation of food for his own table." (*Musso, supra,* 178 So.2d at p. 427.)

Several years later, the Louisiana courts reconsidered the issue in *Loyacano* v. *Continental Insurance Company* (La.Ct.App. 1973) 283 So.2d 302 (*Loyacano*). There the plaintiff broke a tooth after biting into a bone in a piece of meat wrapped in a sealed package and purchased in the defendant's store. The court followed the principles expressed in *Musso* as to implied warranty and strict liability, but adopted the "reasonable expectation" test of liability in considering the plaintiff's negligence claim. The court observed, "It may be said that a product can be considered defective if it does not meet the reasonable expectations of the ordinary consumer as to its safety. It is not the fact that a defect is a natural one which is important to the inquiry, but the fact that the ordinary consumer would expect that he might encounter it, and thus he would naturally take his own precautions." (*Loyacano, supra,* at p. 305.) The court then excepted the defendant from implied warranty and strict liability under the facts before it by utilizing the foreign-natural test of liability. The court concluded, "it seems to us that the strict liability imposed upon vendors of sealed packages of that nature, cannot be imposed upon the vendor here, except insofar as a foreign object would be considered. For a natural object, such as a bone, from the only evidence produced in this case, it appears that the inquiry should be directed to the size of the bone left in the ground meat. (*Ibid.*; see also *Shapiro* v. *Hotel Statler Corporation, supra,* 132 F.Supp. 891.)

After the *Loyacano* court determined that the defendant could not be liable under the theories of strict liability and implied warranty for damages caused

by a natural substance in food, it employed a reasonable expectation test to determine the defendant's negligence. The court explained: "Certainly the reasonable expectation of the ordinary consumer is that the processor and vendor of ground meat would exercise the same care as that which a reasonably prudent man skilled in the art of meat handling would exercise in the removal of bones from the meat. We conclude that the defendant negligently left in the ground meat pieces of bone of a larger size than the consumer might reasonably expect, and is responsible for the damages caused." (*Loyacano, supra,* 283 So.2d at p. 306.)

Finally, both *Musso* and *Loyacano* were discussed and clarified in *Title* v. *Pontchartrain Hotel* (La.Ct.App. 1984) 449 So.2d 677. In *Title,* a hotel restaurant patron brought an action for damages for injuries sustained when the plaintiff bit a pearl contained in an oyster. The court determined that under *Musso* and *Loyacano,* the plaintiff could pursue an action in negligence only. The court explained the rule of liability as follows:

"The determination of negligence requires that construction of a 'reasonable man' whose 'reasonable behavior' must be defined by determined 'reasonable expectations.' *Musso's* approach to implied warranty of purveyors of food is a two-pronged one. If the harmful substance is foreign, the defendant is strictly liable and the analysis stops. If the substance is natural to the food, however, the analysis continues: the negligence of the defendant must be determined. It is here, where the reasonableness of defendant's behavior is being determined, that Louisiana's approach might be mistaken for the 'reasonable expectation' test that a minority of other jurisdictions apply in order to decide whether strict liability is to be applied in the first place. *Loyacano* is not actually applying the minority 'reasonable expectation' test for determination of defendant's strict liability. Rather it applied the 'foreign-natural' test to determine . . . negligence using the language of 'reasonable expectation.' Thus, despite the language that makes *Loyacano* appear to support the minority test, this court did not contradict itself when it stated it was following the majority view expressed in *Musso*." (*Title* v. *Pontchartrain Hotel, supra,* 449 So.2d at pp. 679-680 (Title).)

Thus, the *Title* court concluded that the foreign-natural test would still be employed to determine whether the food could be determined unfit as a matter of law, but that the negligence standard of "reasonableness" would be used to determine whether a defendant could be liable in negligence for an injury-producing substance that was natural to the food served. (*Title, supra,* 449 So.2d at pp. 679-680.)

In 1989, our Court of Appeal adopted the reasoning of the *Loyacano* and *Title* courts in *Evart* v. *Suli* (1989) 211 Cal.App.3d 605, 610-611 [259

Cal.Rptr. 535] (*Evart*). The *Evart* court held that although a hamburger containing a piece of bone is not adulterated or unfit as a matter of law, the presence of a bone in hamburger is not a matter that, in common knowledge, is to be reasonably expected by a consumer. Recognizing that it was faced with the same questions addressed by the *Loyacano* and *Title* courts, *Evart* observed that *Mix* "emphasized several times that a substance causing injury must not only be natural to the type of food, but must also be one which, in common knowledge, should be 'reasonably anticipated' by the consumer. . . . The [*Mix*] court held that a consumer had no right to anticipate or expect an entirely boneless chicken pie because it was a matter of common knowledge that chicken pies contain chicken bones. We do not believe this holding establishes a blanket rule forbidding an inquiry into what a consumer might reasonably expect (or anticipate, to use the court's wording) in cases in which the existence of a potentially harmful natural substance in a food product is *not* a matter of common knowledge. This is such a case." (*Id.* at p. 611, italics in original, citation and fn. omitted.)

Although the *Evart* court concluded that the doctrine of strict liability would not apply "even if broken glass, an obviously foreign object, is the source of the plaintiff's injuries" (211 Cal.App.3d at p. 613, fn. 6), it reversed the trial court's grant of summary judgment for the defendants. (But see Rest.2d Torts, § 402A, com. h [product not defective and seller not liable in strict liability for abnormal preparation but may be strictly liable for harmful ingredients or foreign objects not characteristic of the food].)[4]

Other states have applied the reasoning of *Loyacano, supra,* 283 So.2d 302, in adopting similar rules for determining liability when a natural, but injury-producing, substance contained in food causes harm to a customer. For example, in *Morrison's Cafeteria, supra,* 431 So.2d at page 978, the court observed that it was adopting a reasonable expectation test of liability but, in doing so, noted that the presence of a one-centimeter bone in a fish fillet that injured a patron did not render the fish unfit or "unreasonably dangerous, as a matter of law." The court observed that a food product is unreasonably dangerous under the applicable Alabama Extended Manufacturer's Liability Doctrine, and unfit for consumption under its statutory breach of the implied warranty of merchantability (Ala. Code § 7-2-314 (1975)) if the consumer could not reasonably expect to find such a substance in the dish served. (431 So.2d at p. 978.) In finding no liability under the facts, however, the *Morrison's Cafeteria* court noted that a bone found in a fish filet does not render the fish unfit or unreasonably dangerous under either its manufacturer's liability or implied warranty law. The court explained its holding by

---

[4]As to the discussion of strict liability and foreign objects, we disapprove *Evart v. Suli, supra,* 211 Cal.App.3d 605, to the extent it conflicts with our holding.

observing "that what a consumer is reasonably justified in expecting is a question for the jury [citations]. We agree in most instances this would be true. In other instances, however, we agree with the California Supreme Court in *Mix* v. *Ingersoll Candy Co., supra,* [6 Cal.2d 674], wherein the court held: 'Although it may frequently be a question for a jury as the trier of facts to determine whether or not the particular defect alleged rendered the food not reasonably fit for human consumption, yet certain cases present facts from which the court itself may say as a matter of law that the alleged defect does not fall within the terms of the statute.' " (*Morrison's Cafeteria, supra,* 431 So.2d at p. 978.)

The *Morrison's Cafeteria* court concluded that as a matter of law a restaurant patron should reasonably expect to find a fish bone in a fish filet. (431 So.2d at p. 979.) It observed, "[c]ourts cannot and must not ignore the common experience of life and allow rules to develop that would make sellers of food or other consumer goods insurers of the products they sell. . . ." (*Ibid.*; see also *Carl* v. *Dixie Co.* (Ala. 1985) 467 So.2d 960 [consumer should have reasonably expected chicken bone in chicken breast]; *O'Dell* v. *DeJean's Packing Co., Inc.* (Okla.Ct.App. 1978) 585 P.2d 399 [question of fact for jury whether reasonable expectation of consumer a matter of probability of injury producing substance appearing in food, not possibility]; *Stark* v. *Chock Full O'Nuts* (1974) 77 Misc.2d 553 [356 N.Y.S.2d 403] [reasonable expectation test allows recovery only if natural substance not reasonably anticipated to be in food served; but see *Courter* v. *Dilbert Bros., Inc.* (1958) 19 Misc.2d 935 [186 N.Y.S.2d 334, 343] [no cause of action for prune pit in prune butter because pit is natural to prune and not adulterated substance]; *Zabner* v. *Howard Johnson's, Incorporated* (Fla.Dist.Ct.App. 1967) 201 So.2d 824 [after piece of walnut shell in walnut ice cream injured plaintiff, reasonable expectation test barred claim for breach of implied warranty but allowed negligence claim].)

 In sum, the trend developing in courts recently considering the issue whether a plaintiff may recover for injuries caused by a natural or foreign substance can be summarized as follows: If the injury-producing substance is natural to the preparation of the food served, it can be said that it was reasonably expected by its very nature and the food cannot be determined to be unfit for human consumption or defective.[5] ■■ ■ Thus, a plaintiff in such a case has no cause of action in implied warranty or

[5]Unfortunately, both dissents misrepresent the scope and application of our holding. The term "natural" refers to bones and other substances natural to the product served, and does not encompass substances such as mold, botulinus bacteria or other substances (like rat flesh or cow eyes) not natural to the *preparation* of the product served.

strict liability.[6] The expectations of the consumer do not, however, negate a defendant's duty to exercise reasonable care in the preparation and service of the food. Therefore, if the presence of the natural substance is due to a defendant's failure to exercise due care in the preparation of the food, an injured plaintiff may state a cause of action in negligence. ■■■ By contrast, if the substance is foreign to the food served, then a trier of fact additionally must determine whether its presence (i) could reasonably be expected by the average consumer and (ii) rendered the food unfit for human consumption or defective under the theories of the implied warranty of merchantability or strict liability.

As adopted in most of the preceding decisions, the "reasonable expectation" test differs from the foreign-natural rule of *Mix, supra,* 6 Cal.2d 674, in two important respects. First, whether bones or other injurious substances ought to be anticipated in a particular dish becomes a question for the trier of fact, unless as a matter of law the food was fit for consumption because the substance was natural to the food served. (See, e.g., *Morrison's Cafeteria, supra,* 431 So.2d 975, 978.) Second, and more important, this reasonable expectation test focuses not on the components of the dish, but on the final item sold to the consumer and the expectations that are engendered by the type of dish and the type of preparation used in making the dish. Thus, courts rejecting the exclusive application of the *Mix* foreign-natural test, which by definition bars a negligence claim, have frequently identified the failure to focus on food *preparation* and the consumer expectation that is created by processing or by the nature of the dish sold as the principal analytical defect of the *Mix* rule. (See *Morrison's Cafeteria, supra,* 431 So.2d at p. 978.)

■■■■■ Defendants assert that "public policy and good common sense support the *Mix* rule." They contend that allowing a plaintiff to recover even in negligence for an injury caused by a natural substance is unreasonable because, they assert, this would place a burden on all restaurants to remove all bones. Defendants claim the better policy is "to encourage consumers to be careful."

As noted above, we agree with defendants to the extent they reason that a restaurant patron cannot expect a chicken pie to be free of all bones. Such an expectation would be unreasonable and unrealistic to the ordinary consumer

---

[6]Although we note that the issue of express warranty is not present in this case, we emphasize that our test would not be applicable in the express warranty context.

and would not conform to either federal or state health and safety standards.[7] Moreover, as also discussed above, the implied warranties of merchantability and fitness are based on cases imposing liability for foreign objects in food (see, e.g., Cal. U. Com. Code, § 2314, Cal. Code Com. [see 23A West's Ann. Cal. U. Com. Code, *supra*, § 2314, p. 265]), and the Restatement Second of Torts, section 402A, comment h, emphasizes that the doctrine of strict liability applies in the limited situation arising when foreign objects or ingredients not characteristic of food cause harm. Under these guidelines, therefore, a reasonable plaintiff cannot expect a chicken enchilada always to be free of bones, and defendants owe no duty to provide a perfect enchilada.

On the other hand, we disagree with defendants (and *Mix, supra,* 6 Cal.2d 674) that we should continue to preclude a plaintiff from attempting to state a cause of action in negligence when a substance natural to the preparation of the food product has caused injury. We adopt instead the reasoning of *Loyacano, supra,* 283 So.2d 302, 306, and *Morrison's Cafeteria, supra,* 431 So.2d at page 978, and depart from our foreign-natural rule to the extent it precludes an action against defendants for the failure to exercise due care in the preparation of the chicken enchilada.

Such a new rule, expanding a restaurateur's potential liability and allowing an action in negligence for injuries caused by both natural and foreign substances in food, corresponds to modern developments in tort law. This court has recognized that traditional tort law principles support imposition of a duty of care when one is in a position to exercise custody or control over another. (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 293 [253 Cal.Rptr. 97, 763 P.2d 948]; see also *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) In light of our health and safety standards and our modern emphasis on Civil Code section 1714 (requiring all persons to use ordinary care to prevent injuries as the result of their conduct), we believe a patron can reasonably expect that a restaurateur will exercise reasonable care in preparing chicken enchiladas so that any natural substances contained in the food will not be either of such size, shape or quantity to cause injury when consumed. It is reasonably

---

[7]We note that federal regulations would generally prohibit bones larger than .85 millimeters in any processed foods (see 9 C.F.R. § 319.5(a) (1990)), and would prohibit the use of mechanically processed meats, which may contain bones, in products such as baby or toddler food, ground beef, corned beef, and lima beans with ham (see 9 C.F.R. § 319.6). The federal regulations, which we use to determine "good manufacturing processes" for foods (Health & Saf. Code, §§ 26209, 25210) contemplate harmful substances in foods, but define these as existing at "low levels [that] are not hazardous to health." (21 C.F.R. § 110.110(a) (1990).) Our own standards emphasize that food containing poisonous or deleterious material "is not considered adulterated if the substance is a naturally occurring substance and if the quantity of such substance in the food does not render it injurious to health." (Health & Saf. Code, § 26520.)

foreseeable that a sizable bone could cause the unsuspecting patron substantial injury if swallowed. Under these principles, we believe it is a question for the trier of fact to determine whether the presence of the injury-producing substance was caused by the failure of the defendants to exercise reasonable care in the preparation of the food, and whether the breach of the duty to exercise such care caused the consumer's injury. In so concluding, we emphasize that restaurateurs have available all the traditional defenses to a negligence cause of action, including comparative negligence.[8]

### 3. Conclusion

The strict foreign-natural test of *Mix, supra*, 6 Cal.2d 674, should be rejected as the exclusive test for determining liability when a substance natural to food injures a restaurant patron. We conclude instead that in deciding the liability of a restaurateur for injuries caused by harmful substances in food, the proper tests to be used by the trier of fact are as follows:

If the injury-producing substance is natural to the preparation of the food served, it can be said that it was reasonably expected by its very nature and the food cannot be determined unfit or defective. A plaintiff in such a case has no cause of action in strict liability or implied warranty. If, however, the presence of the natural substance is due to a restaurateur's failure to exercise due care in food preparation, the injured patron may sue under a negligence theory.

If the injury-causing substance is foreign to the food served, then the injured patron may also state a cause of action in implied warranty and strict liability, and the trier of fact will determine whether the substance (i) could be reasonably expected by the average consumer and (ii) rendered the food unfit or defective.[9] Such a rule corresponds to our Legislature's adoption of California Uniform Commercial Code sections 2314 and 2315; the Restatement Second of Torts, section 402A; and the development of our common

---

[8]It is important to note that the duty of care we impose today does not extend to a defendant's assistance or first aid rendered when the customer chokes on a bone. For reasons of public policy, our Legislature has provided that a proprietor must post first aid instructions "designed and intended for use in removing food which may become stuck in a person's throat" (Health & Saf. Code, § 27637, subd. (a)). The statute also provides that "Nothing in this section shall impose any obligation on any person to remove, assist in removing, or attempt to remove food which has become stuck in another person's throat. In any action for damages for personal injuries or wrongful death, neither the proprietor nor any person who removes, assists in removing, or attempts to remove such food in accordance with instructions adopted by the department shall be liable for any civil damages as a result of any acts or omissions by such person in rendering emergency assistance." (Health & Saf. Code, § 27637, subd. (d).)

[9]A number of decisions have deemed it appropriate to apply the doctrine of res ipsa loquitur, where the instrumentality producing the injury was in the exclusive control of the

law. (See Rest.2d Torts, § 402A, com. h [strict liability may be applicable when foreign objects or ingredients not characteristic of food cause harm]; Rest.2d Torts (appen.) § 402A, reporter's notes, note 1, pp. 1-2 [§ 402A supported in California by decisions allowing recovery for foreign objects in food]; *Evart, supra,* 211 Cal.App.3d 605, 611 [agreeing with *Loyacano, supra,* 283 So.2d 302, and *Title, supra,* 449 So.2d 677].)

Thus, we conclude that to the extent *Mix* precludes a cause of action in negligence when injuries are caused by substances natural to the preparation of the food served, it is overruled.

Based on the foregoing, we affirm the Court of Appeal judgment to the extent it directs the trial court to sustain defendants' demurrers to the implied warranty and strict liability causes of action, and we reverse the judgment directing the demurrer to plaintiff's negligence cause of action be sustained. The cause is remanded to the Court of Appeal for further proceedings consistent with this holding.

Panelli, J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Dissenting.—

I

The majority hold that processed food containing a sharp, concealed bone is fit for consumption, though no reasonable consumer would anticipate finding the bone. They declare in effect that the bone is natural to the dish, therefore the dish is fit for consumption. The majority never explain why this should be the rule, when it is universally held that in the analogous case of a sharp bit of wire in processed food, liability occurs under both the implied warranty of fitness and the theory of strict liability for defective consumer products.

Nor does the majority reject the reasoning of cases which impose warranty and strict liability because of a violation of the reasonable expectation of the consumer. The justification offered for the majority's conclusion is that it is the view of the intermediate appellate courts of Louisiana. With all due respect to the courts of Louisiana, most states and commentators would reject the majority's conclusion.

The issue presented by this case is largely semantic: what exactly do we mean when we say an object is "foreign to" or "natural to" a dish? "Natural

defendant and the injury would not have occurred if due care had been exercised. We express no opinion on whether the doctrine applies in this case and leave it to the lower courts to determine whether, on the facts of the particular case, the doctrine should apply.

to" surely cannot include all natural material. Salmonella is natural and feces are natural, but their presence in food surely makes the food unfit for consumption. What about a hamburger made out of chopped rat flesh? Natural food, certainly, but my colleagues would not find such a meal fit for consumption in warranty terms. So what does the term "natural to" mean? I suspect it means that any consumer should anticipate finding the object in the meal. In other words, the object should reasonably be anticipated. When we add, as the majority opinion does, that "natural" means natural to the dish as served, this conclusion becomes inescapable.

Every court knows that the consumer who says he or she does not anticipate a bone in a T-bone steak is not being truthful. Apparently, this court had the same feeling in 1936 about a consumer who said he did not anticipate a bit of bone in a chicken pie. We see the same outrage against the disingenuous consumer in New England cases championing the traditional New England chowder, bones, shells, and all. (See e.g., *Webster* v. *Blue Ship Tea Room, Inc.* (1964) 347 Mass. 421 [198 N.E.2d 309, 312].)

Courts are naturally concerned to protect the restaurateur from that same deceptive consumer. The question remains whether this concern has allowed us to fashion a rational, workable rule of law. I find no such rule in the majority opinion. Rather, I find that the majority has created a rule that seems bizarre in application to mass producers and distributors of processed food, irrational in differentiating between natural and unnatural contaminants, and unfair in saddling the objectively reasonable—and truthful—consumer with costs he or she had no way of protecting against.

## II

A restaurateur sells food under an implied warranty that the food is reasonably fit for consumption. (Cal. U. Com. Code, § 2314; *Mix* v. *Ingersoll Candy Co.* (1936) 6 Cal.2d 674, 681 [59 P.2d 144].) Whether or not the restaurateur is negligent, when a person is injured by a foreign object in food, or by contaminated food, it has long been settled that he or she may bring a cause of action against the purveyor of the food on a theory of breach of implied warranty. (*Goetten* v. *Owl Drug Co.* (1936) 6 Cal.2d 683, 687 [59 P.2d 142].)

From very early times, the common law imposed an extraordinary duty on purveyors of food and drink to provide wholesome, pure products. (See *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]; see also *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 129, fn. 10 [104 Cal.Rptr. 433, 501 P.2d

1153]; Rest.2d Torts, § 402A, com. b; Prosser & Keeton, Torts (5th ed. 1984) § 97, p. 690.) In fact, it was from these cases that the doctrine of strict liability arose. (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 62; *Suvada* v. *White Motor Co.* (1965) 32 Ill.2d 612 [210 N.E.2d 182, 185-186]; *Jacob E. Decker & Sons, Inc.* v. *Capps* (1942) 139 Tex. 609 [164 S.W.2d 828, 832, 142 A.L.R. 1479]; Prosser & Keeton, Torts, *supra,* § 97, at p. 690; Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)* (1960) 69 Yale L.J. 1099, 1103-1114 [tracing doctrine back to 1266 and an English statute prohibiting victualers and cooks from selling "corrupt" food for immediate consumption]; Titus, *Restatement (Second) of Torts Section 402A and the Uniform Commercial Code* (1969) 22 Stan.L.Rev. 713, 735-742 [noting early English cases imposing liability on taverners selling "corrupt" food for immediate consumption].)

It was recognized early on that the warranty of fitness of food was not a matter of contract terms, but was instead a rule of liability imposed as a matter of public policy. It was based on a "distinct implied warranty peculiar to sales of food, although the obligation existed long before implied warranties were recognized. This implied warranty was not based on any reliance by the buyer upon the representations of the seller, or upon his skill and judgment, but was grounded squarely upon the public policy of protecting the public health. . . . [¶] . . . [¶] While a right of action in such a case is said to spring from a 'warranty' it should be noted that the warranty here referred to is not the more modern contractual warranty, but is an obligation imposed by law to protect public health." (*Jacob E. Decker & Sons, Inc.* v. *Capps, supra,* 164 S.W.2d at p. 831; see also *Eisenbeiss* v. *Payne* (1933) 42 Ariz. 262 [25 P.2d 162, 166]; *Race* v. *Crum* (1918) 222 N.Y. 410, 415-416 [118 N.E. 853].)

Our decision in *Goetten* v. *Owl Drug Co., supra,* 6 Cal.2d at page 687, makes it clear that for public health reasons, we impose liability on restaurateurs beyond that arising from the breach of the normal duty of due care: " 'A person who maintains a restaurant, or lunch counter holds himself out as one who has for sale food which, so far as it is under his control, is wholesome and free from foreign substances dangerous to the human system.' " Even where there is no negligence, there may be a cause of action: " 'While there exists the action for damages where negligence of the purveyors of food can be proven, this is not the only protection afforded to their customers. [¶] The application of the rule of implied warranty to cases such as that before us may impose a heavy burden upon the keepers of restaurants and lunch counters, but considerations of public policy and public health and safety are of such importance as to demand that such an obligation be imposed. As between the patron, who has no means of determining whether

the food served is safe for human consumption, and the seller, who has the opportunity of determining its fitness, the burden properly rests with the seller, who could have so cared for the food as to have made the injury to the customer impossible.' " (*Ibid.*)

Thus, courts have imposed extraordinary liability—essentially strict liability—on restaurateurs in order to protect the public health.

We started a wild goose chase, however, when this court declared in 1936 that when the injury is caused by an object which is *natural* to the food being served, there can be no liability. (*Mix v. Ingersoll Candy, supra*, 6 Cal.2d 674 (hereafter *Mix*).) In *Mix*, the plaintiff unwittingly swallowed a sharp fragment of chicken bone contained in a chicken pot pie he consumed in the defendant's restaurant. We affirmed the trial court order dismissing the plaintiff's complaint for negligence and breach of implied warranty.

The *Mix* court explained that the statutory implied warranty of fitness of food (see former Civ. Code, § 1735, now Cal. U. Com. Code, § 2314)[1] does not make the purveyor an insurer, but merely requires that food be reasonably fit for human consumption. Although conceding that it is frequently a question for the jury to determine whether an alleged defect makes food not reasonably fit for consumption, we maintained that a court in certain cases may find as a matter of law that an alleged defect does not make the food unfit for consumption. We explained that it is a matter of common knowledge that chicken pies occasionally contain chicken bones, and suggested that any substance natural to the food being served should be anticipated by the consumer and, as a matter of law, its presence does not make the food unfit for consumption. "Bones which are natural to the type of meat served cannot legitimately be called a foreign substance, and a consumer who eats meat dishes ought to anticipate and be on his guard against the presence of such bones. . . . Certainly no liability would attach to a restaurant keeper for the serving of a T-bone steak, or a beef stew, which contained a bone natural to the type of meat served, or if a fish dish should contain a fish bone, or if a cherry pie should contain a cherry stone—although it be admitted that an ideal cherry pie would be stoneless." (*Mix, supra*, 6 Cal.2d at p. 682.) We concluded as a matter of law that a chicken pot pie containing chicken bones is reasonably fit for consumption. As for the negligence

---

[1]Former Civil Code section 1735 was repealed in 1963 and replaced by California Uniform Commercial Code section 2314: "Unless excluded or modified . . . , a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale. [¶] (2) Goods to be merchantable must be at least such as [¶] . . . [¶] (c) Are fit for the ordinary purposes for which such goods are used; . . ."

claim, we concluded that since the restaurateur had no duty to offer a perfect chicken pie, he or she was not negligent in serving a pie with a bone in it. (*Id.* at pp. 682-683.)

The *Mix* rule does not withstand analysis. Our overriding concern has been public health; there is no difference to public health whether the consumer is injured by an unexpected bit of bone or an unexpected bit of wire. A natural object may cause as much harm *and be as unanticipated* as a foreign object in food, so that it is simply illogical to distinguish between the two solely on the basis of their provenance. (See, e.g., *Ex Parte Morrison's Cafeteria of Montgomery, Inc.* (Ala. 1983) 431 So.2d 975, 978; *Zabner v. Howard Johnson's, Incorporated* (Fla.Dist.Ct.App. 1967) 201 So.2d 824, 826; *O'Dell v. DeJean's Packing Co., Inc.* (Okla.Ct.App. 1978) 585 P.2d 399, 402; *Betehia v. Cape Cod Corp.* (1960) 10 Wis.2d 323 [103 N.W.2d 64, 67].)

A nutshell in a scoop of ice cream, a bit of crystalized corn in a serving of corn flakes or a chunk of bone in a hamburger is as harmful and unanticipated from the injured consumer's point of view as a bit of rock, glass or wire in the same food products. For social policy reasons we have long held the restaurateur strictly liable for injuries caused by unwholesome food, and there is no reason to abandon this social policy when the object in food that causes the injury is "natural."

It is a fallacy to assume that all objects which were a natural part of the ingredients of the food at an early stage of preparation are characteristic of the finished product or are anticipated by the consumer of the finished product. (*Zabner v. Howard Johnson's, Incorporated, supra,* 201 So.2d at p. 826; see also *Ex Parte Morrison's Cafeteria of Montgomery, Inc., supra,* 431 So.2d at p. 978; *O'Dell v. DeJean's Packing Co., Inc., supra,* 585 P.2d at p. 402; *Betehia v. Cape Cod Corp., supra,* 103 N.W.2d at pp. 67, 68-69.) The more highly processed the food, the less it is to be anticipated that injurious natural objects such as shells or bones will be present.

The court in *Zabner v. Howard Johnson's, Incorporated, supra,* 201 So.2d 824, 826, analyzing a case in which the plaintiff was injured by a walnut shell in ice cream, stated the case against *Mix* well: "Categorizing a substance as foreign or natural may have some importance in determining the degree of negligence of the processor of food, but it is not determinative of what is unfit or harmful in fact for human consumption. . . . Naturalness of the substance to any ingredients in the food served is important only in determining whether the consumer may reasonably expect to find such substance in the particular type of dish or style of food served."

And as the Massachusetts high court explained, rejecting its own earlier dicta supporting *Mix*: "The foreign substance—natural substance test exonerates a seller of food from liability for the lack of fitness of the food for

ordinary purposes simply because the injury causing substance was natural to the food. It fails to focus the seller's attention on the consumer's reasonable beliefs . . . ." (*Phillips* v. *Town of West Springfield* (1989) 405 Mass. 411 [540 N.E.2d 1331, 1332-1333].)

I agree with the observation of the Alabama high court: "The undesirability of the foreign substance test lies in the artificial application at the initial stage of processing the food without consideration of the expectations of the consumer in the final product served. Surely it is within the expectation of the consumer to find a bone in a T-bone steak; but just as certainly it is reasonable for a consumer not to expect to find a bone in a package of hamburger meat. It is entirely possible that a natural substance found in processed food may be more indigestible and cause more injury than many 'foreign' substances." (*Ex Parte Morrison's Cafeteria of Montgomery, Inc.*, *supra*, 431 So.2d 975, 978.)

The majority are apparently uncomfortable with the irrationality of the *Mix* rule, discussing with apparent approval the case law establishing that food is unfit for consumption if it contains injurious objects that the reasonable consumer would not reasonably anticipate. In fact, the majority state that they are adopting this "reasonable expectation" standard. Yet, inexplicably, the majority retain the view, which is completely inconsistent with the case law establishing the reasonable expectation standard, that natural objects do not violate the reasonable expectation of the consumer.

Without any particular effort at analysis, the court has put its approval on the Louisiana rule for injuries caused by food. (See *Title* v. *Pontchartrain Hotel* (La.Ct.App. 1984) 449 So.2d 677 (*Title*); *Loyacano* v. *Continental Insurance Company* (La.Ct.App. 1973) 283 So.2d 302 (*Loyacano*).) As I distill the rule, natural objects in food that cause injury can give rise only to a negligence cause of action, requiring the consumer to prove both that he or she did not anticipate the presence of the injurious object, and that the defendant failed to take adequate steps to exclude the object from the food. Foreign objects, however, that cause injury, also give rise to warranty liability and strict liability if the consumer can show they were not reasonably to be anticipated. As one commentator explained, Louisiana's "so-called two-step approach is in reality merely an application of the foreign/natural test, a fact that is clear from the requirement that the plaintiff can recover only by proving negligence when the substance is natural." (Note, *Breach of Implied Warranty: Has the Foreign/Natural Test Lost Its Bite?* (1990) 20 Mem. St. U. L.Rev. 377, 405-406.)

The majority opinion suggests that in a gentle evolution, courts across the country have moved away from the strict *Mix* rule, and that now the

Louisiana rule represents the majority view. Actually, no other jurisdiction has adopted the Louisiana standard. *Loyacano, supra,* 283 So.2d 302, and *Title, supra,* 449 So.2d 677, upon which the majority place great weight, have only been cited in Louisiana cases, with two exceptions. One federal district court cites *Loyacano* as an "example of the confusion which adherence to the foreign-natural distinction can create" and observes that "Texas courts have not descended into this quagmire and this Court is confident that they will not." (*Matthews* v. *Campbell Soup Company* (S.D.Tex. 1974) 380 F.Supp. 1061, 1065, 1066.) The other exception is the Louisiana cases that have been cited in our own Court of Appeal's decision in *Evart* v. *Suli* (1989) 211 Cal.App.3d 605 [259 Cal.Rptr. 535]. But in that case, the court made no suggestion that the plaintiff, who had alleged implied warranty and strict liability claims as well as negligence, should be limited to proving negligence.

The majority opinion claims that "[o]ther states have applied the reasoning of *Loyacano, supra,* 283 So.2d 302, and *Title, supra,* 449 So.2d 677. . . ." In support of this assertion, the majority rely heavily on *Ex Parte Morrison's Cafeteria of Montgomery, Inc., supra,* 431 So.2d 975. Actually, *Morrison's Cafeteria* neither cites the Louisiana cases nor applies the two-step test advocated in Louisiana and in the majority opinion. *Morrison's Cafeteria* is simply an example of a case holding that the reasonable consumer should anticipate the defect complained of. The opinion forthrightly rejects the rigid *Mix* rule, while agreeing that, in some cases, it can be determined as a matter of law that the food complained of is fit for consumption. In place of the *Mix* rule, the court substituted a rule turning on the reasonable expectation of the consumer, in reliance on *Zabner* v. *Howard Johnson's, Incorporated, supra,* 201 So.2d 824. The court in *Ex Parte Morrison's Cafeteria, supra,* 431 So.2d 975, did not limit persons injured by natural defects in food to a negligence cause of action. It concluded, rather, that the reasonable consumer should, as a matter of law, anticipate finding a one-centimeter bit of bone in a fish filet.

Similarly, none of the cases cited in the majority opinion adopt, cite or use reasoning similar to the Louisiana rule that would limit one injured by any natural object to a negligence cause of action. Through these citations, the majority opinion treats any case in which the court has applied the reasonable expectation test and found against the plaintiff as a matter of law as one supporting its view. Our analysis must be more refined, however, because our task is to determine not so much the outcome of this lawsuit as the standard to be applied.

Far from being the majority rule, as the opinion claims, the Louisiana rule is unique to that state. The majority of courts overall, and the clear majority

of recent decisions, have completely abandoned the *Mix* distinction between foreign and natural contaminants in food, and instead analyze the reasonable expectation of the consumer. (*Yong Cha Hong* v. *Marriott Corp.* (D.C.Md. 1987) 656 F.Supp. 446, 448 [aorta in fried chicken wing]; *Matthews* v. *Campbell Soup Company, supra,* 380 F.Supp. 1061 [pearl in canned oyster soup]; *Carl* v. *Dixie Co.* (Ala. 1985) 467 So.2d 960 [bone in chicken]; *Ex Parte Morrison's Cafeteria of Montgomery, Inc., supra,* 431 So.2d at pp. 978-979 [bone in fish fillet should be anticipated]; *Hochberg* v. *O'Donnell's Restaurant, Inc.* (D.C. 1971) 272 A.2d 846, 848-849 [olive pit in olive in martini]; *Koperwas* v. *Publix Supermarkets* (Fla.Dist.Ct.App. 1988) 534 So.2d 872; *Zabner* v. *Howard Johnson's, Incorporated, supra,* 201 So.2d 824, 826-827 [shell in walnut ice cream]; *Bryer* v. *Rath Packing Company* (1959) 221 Md. 105 [156 A.2d 442, 77 A.L.R.2d 1] [bone in chow mein made from canned "boned" chicken]; *Phillips* v. *Town of West Springfield, supra,* 540 N.E.2d at p. 1332 & fn. 1 [bone in cubed turkey dish]; *O'Brien* v. *Dora Ferguson Catering, Inc.* (Mass.App.Ct. 1988) 6 U.C.C. Rep. Serv. 1434 (Callaghan) [bone in chicken pie]; *Feingold* v. *Town Lyne House, Inc.* (Mass.App.Ct. 1983) 36 U.C.C. Rep. Serv. 453 (Callaghan) [crab shell in crab casserole]; *Stark* v. *Chock Full O'Nuts* (1974) 77 Misc.2d 553 [356 N.Y.S.2d 403] [walnut shell in sandwich]; *Allen* v. *Grafton* (1960) 170 Ohio St. 249 [164 N.E.2d 167, 174] [oyster shell in fried oyster plate should be anticipated]; *Thompson* v. *Lawson Milk Co.* (1976) 48 Ohio App.2d 143 [356 N.E.2d 309] [cartilage in chopped ham]; *O'Dell* v. *DeJean's Packing Co., Inc., supra,* 585 P.2d 399 [pearl in canned oysters]; *Williams* v. *Braum Ice Cream Stores, Inc.* (Okla.Ct.App. 1974) 534 P.2d 700 [cherry pit in ice cream]; *Hunt* v. *Ferguson-Paulus Enterprises* (1966) 243 Ore. 546 [415 P.2d 13] [cherry pit in pie]; *Bonenberger* v. *Pittsburgh Mercantile Co.* (1942) 345 Pa. 559 [28 A.2d 913, 143 A.L.R. 1417] [oyster shell in canned oysters]; *Wood* v. *Waldorf Sys.* (1951) 79 R.I. 1 [83 A.2d 90, 93-94] [chicken bone in soup]; *Jim Dandy Fast Foods, Inc.* v. *Carpenter* (Tex.Civ.App. 1976) 535 S.W.2d 786 [unusual bone in fried breast of chicken]; *Battiste* v. *Thomas Diving Corp., Inc.* (V.I. 1979) 26 U.C.C. Rep. Serv. 324 (Callaghan); *Jeffries* v. *Clark's Restaurant Enterprises, Inc.* (1978) 20 Wn.App. 428 [580 P.2d 1103, 1104] [crab shell in crab sandwich]; *Betehia* v. *Cape Cod Corp., supra,* 103 N.W.2d 64 [bone in restaurant chicken sandwich]; see also *Johnson* v. *C.F.M., Inc.* (D.Kan. 1989) 726 F.Supp. 1228 [coffee grounds in cup of coffee; rejects foreign-natural distinction and imposes strict liability without examining expectation of consumer].)

A number of these cases find that the consumer's reasonable expectations have not been violated, but they do not employ the *Mix* or the Louisiana foreign-natural distinction. Rather, they decide on a case-by-case basis whether, as a matter of law, the consumer should have anticipated the object

that caused the injury. (See, e.g., *Ex Parte Morrison's Cafeteria of Montgomery, Inc., supra*, 431 So.2d 975, 978-979 [bone in fish filet should be anticipated]; *Allen v. Grafton, supra*, 164 N.E.2d 167, 174 [oyster shell in fried oyster plate should be anticipated]; *Carl v. Dixie Co., supra*, 467 So.2d 960 [bone in chicken should be anticipated]; *Zabner v. Howard Johnson's, Incorporated, supra*, 201 So.2d 824 [walnut shell in walnut ice cream should be anticipated].)

Thus, not only is the *Mix* view dubious, it is treated as a fallacy and anachronism in the majority of cases decided in the last 30 years. It has no support whatsoever among the commentators. As early as 1951, the foreign-natural distinction received critical reviews. "Insofar as these cases rest on the notion of 'naturalness' in the sense that nothing that is an inherent part of the raw product itself can be a legal defect, they do not hold water." (Dickerson, Product Liability and the Food Consumer (1951) § 14.2, pp. 184-185.)

A more recent comment takes on the foreign-natural distinction as not only irrational and unfair, but a violation of the intent of the Uniform Commercial Code. Calling the test "antiquated and confusing" to which few jurisdictions "cling," this commentator points out that: "It is the failure to recognize the inability of the foreign/natural test to adapt to changing realities of the consumer marketplace that results in inequitable decisions and denies recovery to plaintiffs injured by objects that no ordinary consumer would expect to find in the finished food dish. This failure also undermines the reasoning behind adoption of the breach of implied warranty provisions of the Uniform Commercial Code that provide relief for injured consumers without requiring a showing of negligence on the part of the manufacturer or supplier." (Note, *Breach of Implied Warranty: Has the Foreign/Natural Test Lost Its Bite?, supra*, 20 Mem. St. U. L.Rev. at pp. 407-408, fn. omitted.) The author continues, charging that use of the foreign-natural distinction improperly focuses on the nature of the object found in the food, rather than on the nature of the warranty, which was "meant to be applied as a form of strict liability." (*Id.* at p. 408.) "Application of the foreign/natural test rather than the reasonable expectations test evidences a misunderstanding of the nature of the implied warranty of merchantability with respect to food. The foreign/natural test presumes that the implied warranty refers to the absence of any foreign substances in the food. The true nature of the warranty, however, is that it guarantees that the food will be merchantable, implying that the food can be consumed without resulting injury or illness." (*Id.* at pp. 407-408; see also 3 Anderson, Uniform Commercial Code (3d ed. 1983) § 2-314:185, p. 272 [reasonable expectation test preferable]; Luetto, *Attack of the Killer Enchilada: The Chicken Bone Law Revisited* (1990) 17 Western St. U. L.Rev. 429, 436, 439.)

Normally, of course, the reasonable expectation of the consumer as to the content of food is a question for the jury. (*Ex Parte Morrison's Cafeteria of Montgomery, Inc., supra,* 431 So.2d at pp. 978-979; *Hochberg v. O'Donnell's Restaurant Inc., supra,* 272 A.2d 846, 849; *Williams v. Braum Ice Cream Stores, Inc., supra,* 534 P.2d at p. 702.) It is theoretically possible to determine that a flaw in food does not render the food unfit as a matter of law, but this is so not because the offending object is natural to the dish, but because any reasonable consumer would anticipate the problem. (*Ex Parte Morrison's Cafeteria of Montgomery, Inc., supra,* 431 So.2d 975, 978-979; *Allen v. Grafton, supra,* 164 N.E.2d 167, 174.) I cannot say as a matter of law that the reasonable consumer should anticipate bones in a chicken enchilada. Accordingly, I would hold that the question is one of fact for the jury to determine.

## III

The majority opinion indicates that California Uniform Commercial Code recognizes the foreign-natural distinction. This suggestion is inconsistent with the interpretation of identical language in other jurisdictions. In California, the implied warranty of merchantability is found in Uniform Commercial Code section 2314. It provides that unless excluded, there is a warranty implied in the sale or service of food for value that the item is "fit for the ordinary purposes for which such goods are used." This section is derived verbatim from the Uniform Commercial Code (Cal. Code coms. to Cal. U. Com. Code, § 2314, note 10, 23A West's Ann. Cal. U. Com. Code (1964 ed.) § 2314, p. 266), and thus is identical to the provisions applicable in the many states that have rejected the foreign-natural distinction in the context of a Uniform Commercial Code claim. (See, *Yong Cha Hong v. Marriott Corp., supra,* 656 F.Supp. at p. 448; *Hochberg v. O'Donnell's Restaurant, Inc., supra,* 272 A.2d at p. 848; *Phillips v. Town of West Springfield, supra,* 540 N.E.2d 1331, 1333; *Allen v. Grafton, supra,* 164 N.E.2d at p. 169, 174-175; *Williams v. Braum Ice Cream Stores, Inc., supra,* 534 P.2d at p. 702.) Instead of the *Mix* rule, these cases hold that in the warranty context, the crucial factor in determining whether food is reasonably fit for consumption is the reasonable expectation of the consumer. This is considered the better view in commentary on the Uniform Commercial Code. (3 Anderson, Uniform Commercial Code, *supra,* § 2-314:185, at p. 272.)

While our code comments indicate that the Uniform Commercial Code provision we adopted was considered consistent with *Goetten* and *Mix,* the context of this comment was meant merely to show that the California Uniform Commercial Code is consistent with our earlier law treating the provision of restaurant meals as a sale rather than a service. There is

absolutely no indication that the Legislature intended to adopt the foreign-natural distinction. Other enactments indicate the Legislature's understanding that natural food products may give rise to implied warranty liability. Our Legislature has recognized that food should be considered adulterated by a natural substance if the substance occurs in such quantity as to render it injurious to health. (Health & Saf. Code, § 26520.) Further, the Legislature obviously assumes that defective natural foods may be the basis for liability, since it found it necessary specifically to exempt manufacturers of certain food products, such as sugar and butter, from liability for injuries caused by those products. (See Civ. Code, § 1714.45, subd. (a)(2).) In sum, there is no justification for interpreting the warranty provision of the California Uniform Commercial Code to exclude liability in this context.

The majority opinion is also incorrect in suggesting that the Restatement Second of Torts would limit liability when it is a natural object that causes injury to the consumer of a food product. It cites the Restatement Second of Torts, section 402A, comment h, and page 30. However, the majority should refer to comment e to section 402A of the Restatement Second of Torts, extending the rule of strict liability to unprocessed food, so that "the supplier of poisonous mushrooms which are neither cooked, canned, packaged, nor otherwise treated is subject to the liability here stated." The Restatement Second of Torts has been relied on freely in cases that impose liability for natural defects in food. (*Matthews* v. *Campbell Soup Company, supra*, 380 F.Supp. at p. 1065 [pearl in oyster]; *Jim Dandy Fast Foods, Inc.* v. *Carpenter, supra*, 535 S.W.2d 786, 789 [bone in chicken]; *Gates* v. *Standard Brands, Inc.* (1986) 43 Wn.App. 520 [719 P.2d 130, 134] [bone in candy bar]; see also *Mott's, Inc. of Mississippi* v. *Coco's Family Restaurant* (1988) 158 Ariz. 350 [762 P.2d 637] [strict liability judgment for plaintiff injured by bone in chicken salad].)

## IV

I see no reason to breathe new life into an arbitrary and artificial distinction between natural and foreign defects in food products. This distinction is no longer followed in the majority of jurisdictions that have considered the matter in the last 30 years. The particular form of the distinction upon which the majority rests, the Louisiana rule, is especially inappropriate in that it admits that the consumer may not anticipate certain natural defects in food, but nonetheless limits the injured consumer to a negligence cause of action. I agree with the majority that when the consumer is injured by a foreign object, we should determine liability on warranty and strict liability theories

on the basis of the reasonable expectation of the consumer. In the interest of public health, I would apply the same standard to so-called natural defects.

Kennard, J., concurred.

**ARABIAN, J.**—I dissent.

Plainly stated, the rule announced by the majority is this: If a restaurant patron becomes ill as the result of ingesting a cow's eye inside a hamburger patty there may not be an assertion that the seller breached an implied warranty of merchantability, i.e., that the food was unfit for human consumption, because the injury-producing substance (the cow's eye) was "natural" to the product served and therefore "reasonably" to be expected by the average consumer. However, if the same hamburger contains a pebble or a noxious insect, a claim of unfitness will lie because the injury-producing substance is "foreign" to the product. In my view, a ruling so at odds with fundamental fairness, public policy, and common sense cannot withstand informed scrutiny; worse, its legacy will be that it bred a regressive result.[1]

To understand today's decision, it is necessary to undertake a brief review of the law of implied warranty. As early as 1431, the common law recognized an implied warranty of merchantability in the sale of food. As one medieval lawyer observed, "it is ordained that none [shall] sell corrupt victuals." (Y.B. 9 Hen. VI, f. 53b (1431), quoted in Titus, *Restatement (Second) of Torts: Section 402A and the Uniform Commercial Code* (1969) 22 Stan.L.Rev. 713, 735 (hereafter Titus).) A special warranty rule applicable in food cases evolved in the early American courts, as well. (*Id.* at pp. 736-738.)

The principle underlying the warranty rule was essentially twofold; first, it was recognized that the seller is generally in a better position than the buyer to assure that food is fit for consumption; furthermore, as between an unsuspecting purchaser and a potentially unaware seller, public health and consumer confidence mandate that the innocent consumer be made whole. As one New York court observed at the turn of the century: "This rule is based upon the high regard which the law has for human life. The consequences to the consumer resulting from the consumption of articles of food

---

[1]The majority respond by insisting that a cow's eye is not "natural to the preparation" of a hamburger. (Maj. opn., *ante*, at p. 630, fn. 5, italics omitted.) Yet the majority fail to explain anywhere in their opinion the meaning of that phrase. Is a chicken beak "natural to the preparation" of a chicken enchilada because the preparation process begins with a whole chicken? It is the absence of any principled articulation of what, if anything, distinguishes these two examples that demonstrates the irrationality of the foreign-natural doctrine and illustrates the difficulty courts will face in attempting to apply this artificial distinction.

sold for immediate use may be so disastrous that an obligation is placed upon the seller to see to it, at his peril, that the articles sold are fit for the purpose for which they are intended. The rule is an onerous one, but public policy, as well as the public health, demand such obligation should be imposed. . . . If there be any poison in the article sold, or if its condition render it unfit for consumption, and the consumer be thereby made ill, some one must, of necessity suffer, and it ought not to be the one who has had no opportunity of determining the condition of the article . . . ." (*Race* v. *Krum* (1918) 222 N.Y. 410, 415-416 [118 N.E. 853, 854], quoted in Titus, *supra*, 22 Stan.L.Rev. at pp. 737-738; see generally Prosser, *The Assault Upon the Citadel* (*Strict Liability to the Consumer*) (1960) 69 Yale L.J. 1099 [detailing the gradual extension of the implied warranty from food to nonfood products]; *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].)

By the mid-1930's, California had embraced these principles, as well. In *Goetten* v. *Owl Drug Co.* (1936) 6 Cal.2d 683 [59 P.2d 142] and *Mix* v. *Ingersoll Candy Co.* (1936) 6 Cal.2d 674 [59 P.2d 144] (hereafter *Mix*) our court overruled several prior decisions to hold that the furnishing of food constituted a "sale" within the meaning of the California Sales Act; thus, *Goetten* held that a restaurant patron could recover in warranty for injuries sustained from chewing on a piece of glass in a dish of chow mein. *Mix*, handed down the same day as *Goetten*, underscored the principle that implied warranty attaches to the sale of food, but unfortunately placed an additional gloss on the warranty rule. It was the *Mix* court's view that the implied warranty did not extend to injuries caused by substances "natural" to the food served, such as a chicken bone in a chicken pie; it covered only damage caused by "foreign" substances such as glass, stones, wires or nails. (6 Cal.2d at p. 681.)

The so-called "foreign-natural" distinction announced in *Mix* was soon challenged, however, by a competing standard known as the "reasonable expectation" test. (See *Wood* v. *Waldorf System* (1951) 79 R.I. 1 [83 A.2d 90].) Under the latter, the pivotal question is not whether the injury-producing substance is "natural" or "foreign" to the food served, but rather whether the consumer may *reasonably expect* to find such a substance in the particular type of dish or food. "Naturalness" may be relevant to the determination, but only insofar as it bears on the average consumer's reasonable expectations. (See 3 Anderson, Uniform Commercial Code (3d ed. 1983) §§ 2-314:184 2-314:185, pp. 271-273; 3 Williston on Sales (4th ed. 1974) § 18-10, pp. 100-105.)

The majority opinion rests squarely on the foreign-natural distinction announced over 50 years ago in *Mix*; accordingly, its merit must be judged

against the continued viability of that doctrine. In this regard, the majority argue that the *Mix* rule or a variant thereof "has been followed for over 30 years" by a number of jurisdictions and continues to represent the developing "trend" in the courts. (Maj. opn., *ante*, at pp. 624, 630.) What trend? Six paltry decisions are cited as proof of its ongoing vitality. Three additional cases from the State of Louisiana are offered to demonstrate how one "enlightened" jurisdiction has modified the *Mix* rule so that a consumer injured by a "natural" substance may attempt to prove that the seller was negligent, although the consumer may not claim that the food was unfit for consumption under the usual implied warranty rules unless the substance may be characterized as "foreign." With this, the majority find the Louisiana variant of the *Mix* rule to be persuasive and adopt it as the law in California.[2]

The majority are mistaken. A survey of the leading cases and commentaries reveals that the vast majority have *rejected* the "foreign-natural" rule in favor of the reasonable expectation test. As one federal court (applying Maryland law) recently observed, the " 'reasonable expectation' test has largely displaced the natural-foreign test adverted to by defendants." (*Yong Cha Hong* v. *Marriott Corp.* (D.Md. 1987) 656 F.Supp. 445, 448; see also *Phillips* v. *Town of West Springfield* (1989) 405 Mass. 411 [540 N.E.2d 1331, 1332] ["The reasonable expectations test has been generally recognized as preferable to the foreign substance-natural substance test."].) A recent law review note on the subject also concludes: "The majority of jurisdictions that have addressed cases concerning deleterious, naturally occurring substances in food are moving toward adoption of the reasonable expectation test." (Note, *Breach of Implied Warranty: Has the Foreign/Natural Test Lost Its Bite?* (1990) 20 Mem. St. U.L. Rev. 377, 407 (hereafter Note).)[3]

Turning first to the commentators, it is no exaggeration to say that the doctrine has met with almost universal criticism, if not outright ridicule. In his book on the subject, Professor Dickerson states: "Insofar as these cases rest on the notion of 'naturalness' in the sense that nothing that is an inherent

---

[2]In permitting a claim of negligence for injuries resulting from "natural" substances, the decision represents a small advance on the *Mix* doctrine. Nevertheless, as the majority's allusion to the doctrine of res ipsa loquitur impliedly suggests (maj. opn., *ante*, at p. 633, fn. 9), it is often difficult, if not impossible, to prove actual negligence on the part of the manufacturer or supplier in food cases where the deleterious substance is indigenous to the product served. (See Prosser, *The Assault Upon the Citadel, supra*, 69 Yale L.J. 1099.) The virtue of a warranty action is that proof of actual negligence is not required, though it must still be established that the injury-producing substance was not within the reasonable expectations of the average consumer.

[3]Although as late as 1974 one may still encounter allusions to the foreign-natural test as the "majority" rule (see *Matthews* v. *Campbell Soup Company* (S.D.Tex. 1974) 380 F.Supp. 1061), nearly all of the early decisions that might at one time have supported such a statement have since been discarded in their respective jurisdictions. (See, *post*, at pp. 650-651.)

part of the raw product itself can be a legal defect, they do not hold water . . . [¶] The better test of what is legally defective appears to be what consumers customarily expect and guard against." (Dickerson, Products Liability and the Food Consumer (1951) § 4.2-4.3, p. 185.) Anderson, in his multivolume work on the Uniform Commercial Code, also aligns himself on the side of the reasonable expectation test, pronouncing it the "preferable" rule and concluding: "The reasonable expectation test, rather than the foreign-natural test, should be applied to determine whether there was a breach of warranty . . . ." (3 Anderson, Uniform Commercial Code, *supra*, § 2-314:185, at p. 272.)

More pointed criticism has been levelled, as well. One author, noting the prevalence of processed foods on the market which make it difficult if not impossible for the reasonable consumer to inspect, states: "In an era of consumerism, the foreign-natural standard is an anachronism. It flatly and unjustifiably protects food processors and sellers from liability even when the technology may be readily available to remove injurious natural objects from foods. The consumer expectations test, on the other hand, imposes no greater burden upon processors or sellers than to guarantee that their food products meet the standards of safety that consumers have customarily and reasonably come to expect from the food industry." (Janes, *Products Liability—The Test of Consumer Expectation for "Natural" Defects in Food Products* (1976) 37 Ohio St. L.J. 634, 652.)

Another scholar has written: "The [foreign-natural] distinction makes bad sense. It makes even worse law. If the court were taken seriously, one is confronted by the ludicrous spectacle of the chef in the local hashhouse carefully culling the chicken chow mein to remove any ground glass, tacks or other debris he might encounter while disdainfully ignoring the serrated chicken bones therein on the assumption that the *Mix* decision immunizes him from liability." (Ezer, *The Impact of the Uniform Commercial Code on the California Law of Sales Warranties* (1961) 8 UCLA L.Rev. 281, 304.)

The most recent article on the subject concludes that, in those few jurisdictions which still "cling to the antiquated and confusing foreign/natural test," the result is "inequitable decisions" and the denial of recovery "to plaintiffs injured by objects that no ordinary consumer would expect to find in the finished food dish. This failure also undermines the reasoning behind the adoption of the breach of implied warranty provisions of the Uniform Commercial Code that provide relief for injured consumers without requiring a showing of negligence on the part of the manufacturer or supplier." (Note, *supra*, 20 Mem. St. U.L. Rev. at p. 407.)

Turning from the commentators to the cases, one finds the response to the foreign-natural doctrine equally if not more critical. The position of the

courts which reject the doctrine is well stated in *Zabner* v. *Howard Johnson's, Incorporated* (Fla.Dist.Ct.App. 1967) 201 So.2d 824, 826: "The 'foreign-natural' test as applied as a matter of law . . . does not recommend itself to us as being logical or desirable. [¶] The reasoning applied in this test is fallacious because it assumes that all substances which are natural to the food in one stage or another of preparation are, in fact, anticipated by the average consumer in the final product served. It does not logically follow that every product which contains some chicken must as a matter of law be expected to contain occasionally or frequently chicken bones or chicken-bone slivers because chicken bones are natural to chicken meat and both have a common origin. . . . Naturalness of the substance to any ingredients in the food served is important only in determining whether the consumer may reasonably expect to find such substance in the particular type of dish or style of food served. . . . [¶] . . . [¶] The test should be what is '*reasonably expected*' by the consumer in the food as served, not what might be natural to the ingredients of that food prior to preparation."

These criticisms are amplified in the frequently cited case of *O'Dell* v. *DeJean's Packing Co., Inc.* (Okla.Ct.App. 1978) 585 P.2d 399, 402: "Oftentimes, extensive damage and even death is caused by a substance in the prepared food that is 'natural' to the food item in its *original state*. Thus, there seems little logic in the 'foreign-natural' test. It appears the weakness in this test leads to ridiculous results. Where is the line drawn? For example, chicken bones are natural to chicken, but so are beaks, claws, and intestines. One therefore wonders what the courts in the jurisdictions following the 'foreign-natural' test would decide in the chicken soup case if it were a chicken beak or claw that caused the damage rather than a chicken bone, because all three parts are 'natural' to the chicken. . . ."[4]

"If one purchases a whole fish to bake surely he or she could 'reasonably expect' to find bones in it. . . . [¶] If one 'reasonably expects to find an item in his or her food then he guards against being injured by watching for that item. When one eats a hamburger he does not nibble his way along hunting for bones because he is not 'reasonably expecting' one in the food. Likewise, when one eats processed oysters, normally one does not gingerly graze through each oyster hunting for a pearl because he is not 'reasonably expecting' one in the food. It seems logical some consideration should be given to the manner in which the food is normally eaten in determining if a person can be said to 'reasonably expect' an item in processed food." (*O'Dell* v. *DeJean's Packing Co., Inc., supra*, 585 P.2d at p. 402.)

---

[4]The question raised by an incredulous court in *O'Dell* is specifically addressed by the majority here, who are apparently satisfied that chicken beaks, claws and intestines, being "natural" to the chicken, may reasonably be expected by the consumer and thus may not support a claim for breach of implied warranty. (Maj. opn., *ante*, p. 630, fn. 5.)

Criticisms similar to those quoted above appear in cases far too numerous to quote at length. Recently, the foreign-natural test has been dismissed as "artificial" (*Ex Parte Morrison's Cafeteria of Montgomery, Inc.* (Ala. 1983) 431 So.2d 975, 978) and "unsound from the outset" (*Jackson v. Nestle-Beich, Inc.* (1991) 212 Ill.App.3d 296 [569 N.E.2d 1119, 1123]).[5] In addition to those previously noted, cases that have rejected the foreign-natural distinction in favor of the reasonable expectation standard include: *Carl v. Dixie Co.* (Ala. 1985) 467 So.2d 960; *Hochberg v. O'Donnell's Restaurant, Inc.* (D.C. 1971) 272 A.2d 846; *Johnson v. C.F.M., Inc.* (D.Kan. 1989) 726 F.Supp. 1228; *Yong Cha Hong v. Mariott Corp., supra,* 656 F. Supp. 445; *Stark v. Chock Full O'Nuts* (1974) 77 Misc.2d 553 [356 N.Y.S.2d 403]; *Williams v. Braum Ice Cream Stores, Inc.* (Okla.Ct.App. 1974) 534 P.2d 700; *Bonenberger v. Pittsburgh Mercantile Co.* (1942) 345 Pa. 559 [28 A.2d 913, 143 A.L.R. 1417]; *Wood v. Waldorf Systems, Inc., supra,* 83 A.2d 90; *Allen v. Grafton* (1960) 170 Ohio St. 249 [164 N.E.2d 167]; *Thompson v. Lawson Milk Co.* (1976) 48 Ohio App.2d 143 [356 N.E.2d 309]; *Jim Dandy Fast Foods, Inc. v. Carpenter* (Tex.Civ.App. 1976) 535 S.W.2d 786; *Matthews v. Campbell Soup Co., supra,* 380 F.Supp. 1061; *Jeffries v. Clark's Restaurant Enterprises, Inc.* (1978) 20 Wn.App. 428 [580 P.2d 1103]; *Betehia v. Cape Cod Corp.* (1960) 10 Wis.2d 323 [103 N.W.2d 64].[6]

And what of the five jurisdictions cited by the majority as proof of the rule's continuing vitality? (Maj. opn., *ante,* at pp. 624-625.) The majority do not reveal that one, Illinois, has recently declined to follow its own 50-year-old precedent in *Goodwin v. Country Club of Peoria* (1944) 323 Ill.App. 1

[5] The majority imply that the court in *Morrison's Cafeteria, supra,* 431 So.2d 979, relied on the foreign-natural doctrine in holding that the plaintiff could not state a claim for breach of implied warranty. This is incorrect. The Alabama court clearly did *not* reject the plaintiff's claim, as the majority assert, "because the substance was natural to the food served." (Maj. opn., *ante,* at p. 631.) On the contrary, the Alabama court flatly rejected the foreign-natural doctrine: "The undesirability of the foreign substance test lies in the artificial application at the initial stage of processing the food without consideration of the expectations of the consumer in the final product served . . . . [¶] The 'reasonable expectation' test . . . appears to us a more logical approach." (431 So.2d at p. 978.) The Alabama court did take into account the fact that the substance in question (a one-centimeter bone in a piece of fish) was natural to the food served, but only as evidence that a reasonable consumer should have expected to find the substance. (*Id.* at p. 979.)

[6] The majority cite several of the foregoing decisions (*Carl v. Dixie Co., supra,* 467 So.2d 960; *O'Dell v. DeJean's Packing Co., Inc., supra,* 585 P.2d 399; *Stark v. Chock Full O'Nuts, supra,* 356 N.Y.S.2d 403; and *Zabner v. Howard Johnson's, Incorporated, supra,* 201 So.2d 824) to suggest that the "trend" developing in the courts is to hold that if the deleterious substance is "natural" it must have been expected "by its very nature and the food cannot be determined to be unfit for human consumption or defective." (Maj. opn., *ante,* at p. 630.) This is misleading if read to suggest that any of the foregoing decisions relied on the "foreign-natural" distinction in making its determination. In fact, each of the foregoing decisions explicitly rejected the *Mix* doctrine as unduly artificial. The "naturalness" of the injury-producing substance was considered only in determining whether, under the circumstances, a consumer would reasonably have expected to find the substance in the particular food served.

[54 N.E.2d 612], opting instead for the reasonable expectation test. (See *Jackson* v. *Nestle-Beich, Inc., supra,* 569 N.E.2d 1119, 1124 ["After reviewing the foregoing, we conclude that the foreign-natural doctrine originally set forth in *Mix* and adapted by the second district in *Goodwin* should not be followed."].) Nor does the majority appreciate the fact that another, North Carolina, recently declined to read *Adams* v. *Great Atlantic & Pacific Tea Co.* (1960) 251 N.C. 565 [112 S.E.2d 92], as adopting a "true" foreign-natural test, construing it instead as a reasonable expectation case. (*Goodman* v. *Wenco Management* (1990) 100 N.C.App. 108 [394 S.E.2d 832, 835] ["the *Adams* test leads to approximately the same result as the 'reasonable expectation' test"].)

As to the remaining cases on which the majority rely, *Brown* v. *Nebiker* (1941) 229 Iowa 1223 [296 N.W. 366], is not a true foreign-natural decision; although it cites *Mix*, its holding is based on the conclusion that one who eats a pork chop "ought to anticipate and be on his guard against the presence of bones, which he knows will be there." (*Id.* at p. 371.) Similar reasoning underlies the Massachusetts decision in *Webster* v. *Blue Ship Tea Room, Inc.* (1964) 347 Mass. 421 [198 N.E.2d 309] (famous for the wonderful fish chowder recipe contained therein). Although the case is often cited to support the foreign-natural rule, in fact its reasoning is simply that fish bones in New England fish chowder ought to be "anticipated" by the reasonable consumer. (*Id.* at p. 312.) "It is not too much to say that a person sitting down to consume a good New England fish chowder embarks on a gustatory adventure which may entail the removal of some fish bones from his bowl as he proceeds." (*Ibid.*) Indeed, the Massachusetts high court has recently joined the majority of jurisdictions in rejecting the foreign-natural doctrine, observing of its earlier decision: "This court's discussion in its *Webster* opinion focused on the reasonable expectations of a consumer of fish chowder and concluded, as a matter of law, that bones in fish chowder should reasonably be expected . . . . In our view, the reasonable expectations test is the appropriate one to apply in determining liability for breach of warranty of merchantability . . . ." (*Phillips* v. *Town of West Springfield, supra,* 540 N.E.2d at p. 1333.)

Thus apart from the States of Georgia (where *Norris* v. *Pig'n Whistle Sandwich Shop* (1949) 79 Ga.App. 369 [53 S.E.2d 718], appears to still be good law) and Louisiana (which is unique among the 50 states for the absence of a common law tradition) the foreign-natural rule lacks substantial support in any jurisdiction in the United States. Indeed, as the foregoing discussion demonstrates, the doctrine has been so thoroughly savaged by courts and commentators alike that its significance today is largely historical: a quaint relic from a distant past. Such is the state of the legal and moral fossil into which the majority seek to breathe life.

Finding cold comfort in the case law and commentaries, the majority next attempt to bolster their position through resort to legislative history. The effort is equally unavailing. In support of its holding, the majority state that the Legislature "was aware of" the *Mix* rule when it repealed former Civil Code section 1735 and adopted the implied warranty sections of the Uniform Commercial Code. (Cal. U. Com. Code, §§ 2314, 2315.) The California code comment to section 2314 does make reference to *Mix*; however, the comment merely notes that the statute's definition of a "sale" as including the serving of food and drink "is in accord with prior California case law. *Klein v. Duchess Sandwich Co.*, 14 Cal.2d 272 . . . and *Mix v. Ingersoll Candy Co.*, 6 Cal.2d 674 . . . ." (See 23A West's Ann. Cal. U. Com. Code (1964 ed.) § 2314, p. 265.) As noted earlier, this was a matter of some controversy preceding the adoption of the Uniform Commercial Code. (See 3 Williston on Sales, *supra*, § 18-10, at p. 100.) *Mix* overruled prior case law (especially *Loucks v. Morley* (1919) 39 Cal.App. 570 [179 P. 529]) to hold that the implied warranty applied to the furnishing of food. (See Ezer, *The Impact of the Uniform Commercial Code on the California Law of Sales Warranties*, *supra*, 8 UCLA L.Rev. at pp. 293, 303-304 ["the California Supreme Court did not delay overlong in reversing *Loucks* and adopting the precept, now codified by the UCC, that restaurant transactions are sales."].) The majority's implication that the California Uniform Commercial Code adopted the foreign-natural rule finds no support in any official commentary or other authority of which I am aware.[7]

CONCLUSION

Oliver Wendell Holmes, Jr., observed that "precedents survive in the law long after the use they once served is at an end and the reason for them has been forgotten. The result of following them must often be failure and confusion . . . ." (Holmes, The Common Law (Howe edit. 1968) p. 31.) In perpetuating an antiquated and universally rejected precedent (*Mix v. Ingersoll Candy Co.*, *supra*, 6 Cal.2d 674), and in ignoring a vast body of contrary precedent, the majority fulfill Holmes's dual prophesy. Unfortunately the "confusion" will be the burden of the lower courts and the bar as they attempt to understand and apply an outdated legal doctrine. The "failure" lies exclusively with us, in neglecting our fundamental responsibility to marshall all the applicable precedents, to extract the basic principle, and then, as Cardozo so insightfully explained, to "determine the path or direction along

---

[7]Because the overwhelming mass of authority cited above addresses the issue in the context of the seller's liability for breach of implied warranty rather than strict products liability, and because I find that the briefing in this case does not fully develop the products liability issue, I confine my remarks to defendant's liability for breach of warranty.

which the principle is to move, if it is not to wither and die." (The Nature of the Judicial Process (1921) pp. 28-31.)